PORTSMOUTH SAVINGS BANK *v.* CITY OF SPRINGFIELD.

(*Circuit Court, S. D. Illinois. ———, 1880.*)

1. MUNICIPAL BONDS — QUESTIONS AS TO VALIDITY.—All questions of doubt in relation to the validity of municipal bonds should be answered in favor of their legality, where the city has repeatedly recognized the validity of such bonds, and has paid interest on them for a series of years.

———, for plaintiff.
———, for defendant·

DRUMMOND, C. J. All questions of doubt in relation to the validity of these bonds should be answered in favor of their legality, because the city has recognized their validity repeatedly, and has paid the interest on them for a series of years. Therefore, under such circumstances as these, it should appear beyond all doubt that the issue of the bonds was void.

First, as to the state-house bonds: By the act of February 25, 1867, the governor was authorized to convey to the county of Sangamon and to the city of Springfield, for the use of the county and city, a piece of land known as the public square, upon which was located the state house, for the sum of $200,-000, and for the further consideration that the city and county should cause to be conveyed to the state a certain parcel of ground which was described. The law authorized the county of Sangamon and the city of Springfield to issue such bonds

and levy such taxes as might be necessary to raise the sum of $200,000, and for the purchase of the tract of land which the city and county were required to convey to the state.    In pursuance of this law some of the bonds in this case were issued by the city of Springfield, reciting that they were issued under this law, and for the purposes designated in the law.

The only objection of any force against these bonds is that, as the law authorized the governor to convey the particular lot of land called the state-house square to the county and city, and also authorized the county and the city to issue bonds, they have not been issued by the city and county jointly. It is true that the law might have been, and ought, perhaps, to have been, more specific in relation to the manner in which the bonds should be issued, but we have to take as it is and construe the law.    Under the facts before the court it seems that the bonds in controversy here were issued by the city alone.    Does that fact render this class of city bonds inoperative?    I think not.    There are many reasons why the construction which was given by the city and county authorities was proper, and such a construction as the statute warranted. There would undoubtedly be great difficulties and embarrassments connected with the issue and payment, by taxation or otherwise, of bonds given by the city and county jointly. They are separate and distinct corporations.    True, the city is a corporation within the county of Sangamon, but in the administration of what are called governmental affairs, and nearly all of which concern the welfare of the people, the mayor and common council of the city have exclusive authority.    The county has no jurisdiction and control over much which pertains to the welfare of the citizens of Springfield, so that it was not unnatural, I think, when this statute came to be considered by the citizens of the city and of the county, that an arrangement should be made between them by which they should sever in the bonds which the law contemplated should be given, so that a separate distribution should be made.    That it was, in fact, made, does not particularly appear as to the funds to be raised, although it is admitted that an amicable arrangement was made between the respective

corporations, and the bonds were issued by them separately. There might be other reasons mentioned which might cause the city and county to sever in the issue of bonds; but enough, I think, has been stated to show that it was not a violent or forced construction of this statute that the two corporations should issue bonds separately. Under all the circumstances of the case, can the city of Springfield be allowed, at this time, even admitting that there was a doubt in relation to the point above considered, to come in and contest the validity of these bonds, on the ground that they ought to have been jointly issued with the county? It ought to be clear that such issue was in violation of the statute, and that it was not competent for the city to exercise the powers it did. I think that is not the fact.

Many of the authorities which might be referred to would apply to a case like this. These bonds were issued under this statute. The interest on them has been paid, and their legality and validity never denied, for many years, and it would be hard on *bona fide* holders of these bonds to allow the city at this time to contest their validity.

As to the bonds given by the city called the water-works bonds, I have, during the argument, adverted to the statute upon the subject, but will now briefly recur to it to show that these bonds are also valid. They were issued under a statute of the state to incorporate the Springfield Water-works Company. By this statute there was a special corporate power created, which was clothed with authority to do certain acts in connection with the administration of the municipal affairs of the town, but it was not intended this corporate power should be severed from the city of Springfield; it was to be a power of the city of Springfield, and to carry out, through a separate and distinct body, one of the objects for which the city of Springfield was created as a corporation. It was so intended because it was supposed that a body of men specially selected with a view to their qualifications for such a duty, and having, to a certain extent, an independent authority, would be more competent to execute the powers which the legislature had in view when it passed this law.

The whole scope of the law shows that this special body was a part of the municipality of Springfield, although independent of its functions and power. By the eighth section of the act these commissioners thus created had authority to borrow money if the city council should deem it expedient; but they had not the right to borrow independent of the city council. Money was to be borrowed upon the credit of the city. They were to have power also, with the approval of the city council, to issue bonds, pledging the faith and credit of the city for their payment, principal and interest. These bonds were to be issued under the corporate seal of the city, signed by the mayor and clerk, and made payable at such places, and in such currency, as they should deem expedient; and such bonds were not to be issued until the city council should approve of their issue by a vote of a majority of all the aldermen by law authorized to be elected.

Now, it clearly appears, from these provisions of the statute, that although there was a separate corporate body created by this law, called the water commissioners, in relation to the issue of bonds they had not authority of themselves, but must act in co-operation and in connection with the city. They could not take a step without the authority of the city, and the bonds, when issued, were to be issued under the signatures of the mayor and clerk, and the seal of the city, as well as on its credit. Now, it would be a contradiction in terms to say that when all these requisites of the law are complied with, as they have been in this case, these were not the bonds of the city, and that this was not a legal obligation of the city of Springfield, because the water commissioners co-operated with the city authorities in the issue of the bonds. But the statute provided that the funds derived from the sale of the bonds were to be exclusively used for the purposes specified in this act, namely: for the creation and continuance of the water-works which were to supply the city with water. And the law also provided that the commissioners should have power from time to time to assess the amounts to be paid for water, and the water rents were to be a lien upon the buildings supplied with water, which water rents

were to pay for the interest and liquidation of these bonds. In other words, there was a special fund raised in a special way, and to be appropriated to a special purpose, under this law. There can be no doubt that this is a debt of the city of Springfield, and for it. If it becomes due and is not paid the city of Springfield is liable, and a judgment can be rendered against the city. But as to how that judgment shall be paid is another question, and may depend upon the particular provisions of law which are applicable to that species of debt, and which it is not necessary now to consider, though it may become necessary, provided a judgment is rendered and the parties for whom it is rendered seek to have it paid. In what manner that shall be done it may be for the court to determine under the various provisions of law. Undoubtedly, an ordinary execution could not issue against the city, but it would probably have to be paid out of the particular fund which was intended to be appropriated by law, under the action of the commissioners, to the debt itself.

The high-school and sewerage bonds I may consider together. As I understand, the charter gives the city the right to borrow money. The charter prescribes what shall be the duties of the city authorities, and what they shall have the right to do—what improvements they shall make, what buildings they may construct, and everything connected with the general welfare of a community like the city of Springfield. It was intended, in other words, by the charter, to clothe the city authorities with all the powers necessary for the welfare, safety, and government of a town or city like Springfield. Certainly, as a part of the duty thrown upon the city authorities, it became proper and right for them to improve their streets, to construct sewers, to build school-houses, and to determine in what manner they should be constructed, how they should be regulated, and everything connected with the management and control of schools and school-houses. Now, this being a part of their duty vested in them by the charter, they are authorized to borrow money. Clearly, they are authorized by the charter to borrow money and to issue bonds for all legitimate purposes connected with the performance of

their duty, whether the construction of school-houses, the payment of the salaries of teachers, the improvement of streets, the building of sewers or bridges. The charter does not limit the power of the city to borrow money to any particular purpose. It does not say that they shall borrow money for this purpose or that only. The clear, reasonable construction of the charter is that the city authorities shall have the right to borrow money for any legitimate purpose, in connection with the authority vested in them by the charter itself. Therefore, I can have no doubt that it was perfectly proper for the authorities to expend money, and to borrow for the purpose of paying for such expenditures; as, for instance, building a school-house of any grade, or making sewers, for such purposes are certainly within the ordinary municipal duties of a city council. The fact that the charter authorizes the city to impose taxes for the construction of school-houses, or sewers, or for the improvement of streets, does not take away the powers of the city also to borrow money for those purposes, and the power to issue bonds still exists, notwithstanding the right to impose taxes for the purpose of building a school-house or constructing sewers.

As to the railroad bonds, I do not see how their validity can be successfully contested. There was authority given to make the subscription, and it was made, and bonds were issued and stock obtained, and, in some instances, voted for, as the proof shows. And as to the necessity, in some of the cases, for a vote by the people in respect to the re-issue of bonds, I do not see that that was necessary, for, it being once admitted that the city authorities had the power to issue these bonds, that, undoubtedly, carried with it the authority to renew the bonds, or to take them up and supply their place with other bonds; and I do not think it can be expected that those who took bonds under such circumstances—that is, re-issued bonds—can be required to look into all the details connected with the manner in which the old bonds had been taken up and the new ones issued. It may be that there were irregularities connected with the issue of new bonds. I am not saying that there were, but suppose that there were.

Still, I do not think that that would render the re-issued bonds invalid.

I have not thought it necessary to take further time for the purpose of giving my general views in relation to the validity of these bonds. If I took more time, and looked into the case more fully, I might go more into detail than I have; but the equity of the holders of these bonds does seem so strong that no court, unless under a sort of moral or legal compulsion, would feel inclined to say, under all the circumstances of this case, that these bonds were invalid. Having been issued for so long a time, the interest on them having been paid, and their validity having been recognized again and again in after years by the city authorities, it does seem as though it is too late now, under all the circumstances of this case, for the city to question their validity. I therefore hold that they are valid, and the city is liable. It has issued the bonds, obtained the money and the benefits it has conferred, and law and equity declare that the debt should be paid.