AMANDA SAGER, Administratrix of the Estate of W. F. SAGER, A. D. McGINNIS, A. R. PERRY, WILLIAM HALE, S. W. WHEELER, H. B. SORENSON, A. G. HEYDE, GEORGE W. ALLEN, JAMES WILSON and MISSOURI SERVICE COMPANY, a Corporation, Appellants, v. THE CITY OF STANBERRY, a Municipal Corporation of Gentry County, CLAUDE L. ENYART, Mayor of said City of Stanberry, JAMES A. MOORE, Clerk of said City of Stanberry, SETH HINKLEY, Treasurer of said City of Stanberry and the successors in office of said parties, and each and all of them and FIDELITY NATIONAL COMPANY, a Corporation, and FULTON IRON WORKS COMPANY, a Corporation.—78 S. W. (2d) 431.

Division One, December 21, 1934.

R. B. Caldwell, H. M. Noble and McCune, Caldwell & Downing for appellants.

*William S. Hogsett, Ralph E. Murray* and *Hogsett, Smith, Murray & Trippe* for respondents.

FERGUSON, C.—This is a suit in equity brought by certain residents and taxpayers of the city of Stanberry to enjoin a sale by the city of Stanberry to the defendant Fidelity National Company of a bond issue of the city of Stanberry in the amount of $40,000, duly voted and authorized "for the purpose of providing funds for the erection or purchase of a municipal electric lighting system for said city" and also to enjoin and restrain the carrying out of a contract entered into between the city of Stanberry and the defendant Fulton Iron Works Company for the "lease" or purchase of Diesel engines and generating equipment by the city from that company. The trial court found for defendants, denied the relief prayed and dismissed the petition. Plaintiffs have appealed.

Stanberry is a city of the fourth class having a population of approximately two thousand. The construction of a municipal electrical plant and system for the city of Stanberry being deemed desirable a special election was held in March, 1928, at which bonds of the city in the amount of $40,000 were authorized for the purpose of "erecting or purchasing a municipal electric lighting system for said city." The amount of the indebtedness so authorized was well within the debt limitations fixed by Sections 12 and 12a of Article 10 of our State Constitution and the validity of the bond issue is not questioned. However, this sum of $40,000 was not sufficient to meet the cost of a complete electrical plant or system. As the entire amount ($40,000) to be realized from the sale of bonds would be required for the construction of a complete distribution system including "a white way," and a building to house the generating plant no funds were available for the purchase of generating equipment. The plan devised and undertaken contemplated the purchase of two Diesel engines and other necessary equipment for the generating plant under a contract providing for the payment of the purchase price thereof in deferred monthly installments out of the net earnings or receipts of the system. The specifications called for two 200 horse power Diesel engines. Bids covering the two engines, generators and accessories were received and that of the defendant Fulton Company accepted. The bonds were sold to the defendant Fidelity National Company at $98.18 per $100 par value but certain taxpayers insti-

tuted a suit to enjoin the sale because the bonds had been sold for less than par (Sec. 7220, R. S. 1929) and thereupon the contract for the sale of the bonds was rescinded by mutual agreement and the suit dismissed. Thereafter the city continued its efforts to sell the bonds but could not find a purchaser therefor at par. This development brought the construction plans to a standstill awaiting and dependent upon the sale of the bonds. Approximately six months having elapsed with this situation in reference to the sale of the bonds unchanged the Fulton Company under date of September 24, 1929, wrote a letter to the Fidelity National Company as follows:

"As you know, negotiations between this company and the city of Stanberry for the installation of two of our Diesel engines have been pending for approximately a year last past. We were awarded contract for these engines in September of last year, but have been unable to consummate the transaction, chiefly on account of difficulties of the city in financing the sale of $40,000 face amount of its bonds.

"Under the existing circumstances, we feel that our interest in the situation warrants us in agreeing with you to pay you, simultaneously with the delivery to you of the bonds by the city, the difference . . . between par and your bid on the bonds in consideration of your payment to the city for these bonds at par. This is, of course, subject to due execution by all parties of all of the contracts including the engine contract in connection with this power plant and distribution system.

"We would request that you kindly keep this proposal of ours confidential, as we believe it particularly unwise that this arrangement should become known to the city or its officials. As a matter of fact, there is practically no profit in the transaction for us and we are only interested in completing the deal because of the value of installing this new type of engine in this location."

Apparently acting upon this proposal the Fidelity National Company then offered to pay par for the bonds. About this time negotiations were entered into between the city officials and the Fulton Company looking to the purchase of two 240 horse power Diesel engines instead of the two 200 horse power engines originally specified and an agreement resulted whereby the Fulton Company was to furnish the two 240 horse power engines and the other machinery and equipment included in the original bid, at an increase in the purchase price of $5240. At a meeting of the board of aldermen on October 7, 1929, the offer of the Fidelity National Company to purchase the bonds at par was formally accepted and the issuance and sale of the bonds authorized and the terms and conditions thereof confirmed and the execution of the contract with the Fulton Company for the two 240 horse power engines and generator equipment

218

ordered. At the same time other contracts providing for the construction of the distributing system and building were also authorized.

This suit has a double objective; (1) to enjoin the sale of the bonds to the Fidelity Company and (2) restrain the carrying out of the contract between the city and the Fulton Company for the purchase of engines and machinery. As to the first contention plaintiffs (appellants) allege and claim that the contract for the sale of the bonds to the Fidelity Company was "illegal and void . . . because fraudulently and wrongfully entered into . . . through conspiracy and fraud of the" Fulton Company, the Fidelity Company and the city "to effect a sale of the $40,000 bond issue ostensibly at par but in reality at less than par." Plaintiffs' theory seems to be that it was circumstantially shown, by the evidence, that the purchase of the two 240 horse power engines and other equipment at an increase in price over that originally fixed and agreed upon as the purchase price for two 200 horse power engines and equipment was a mere subterfuge or scheme adopted as a means to cover or refund the difference between the amount less than par originally bid for the bonds and the par value thereof finally offered by the Fidelity Company and accepted by the city so that thereby the bonds were in fact sold at less than par and that thus by indirection that was done which could not legally be done directly.

As the writer understands, plaintiffs' argument is that granted that the change made from 200 horse power engines to 240 horse power engines was desirable and necessary nevertheless the price of the larger powered engines was, pursuant to an understanding among the defendants, padded or increased in an amount above the reasonable and proper cost thereof sufficient to thereby effect a refund of the difference between the original bid on the bonds and the par value thereof. This involves the weight and value to be accorded the evidence, and the inferences therefrom, and the credibility of the witnesses. It is indisputably established, that the city had been unable to sell the bonds at par; that after considering numerous bids for engines and generating equipment the city officials had found the price and terms and conditions upon which the Fulton Company offered to furnish same the most favorable and had concluded to enter into contract therefor with that company; that the inability to sell the bonds at par prevented the city from proceeding with the construction of the proposed electrical plant or system; that the purchase price originally agreed upon with the Fulton Company, on a cash basis, for two 200 horse power engines and other specified equipment and machinery was $43,600 and that when the requirements in capacity of the engines were increased 40 horse power, the purchase price, on a cash basis, for the engines and other equipment was fixed at $48,840, an increase over the original purchase price of $5,240; that the Fulton Company in order to close its deal with the

city offered and agreed with the Fidelity Company to refund to it the difference between par value of the bonds and the amount less than par that company had bid therefor if the Fidelity Company would offer par for the bonds and that pursuant thereto the Fidelity Company offered to pay the city par for the bonds and that the offer was accepted by the city. It clearly appears from the testimony of plaintiffs' own expert engineer that the increased engine capacity was desirable and proper. He stated: "I think the capacity should be still further increased and do not criticize the Board of Public Works for increasing the capacity of the engines from the old to the new. In my judgment, increase in the capacity of the engines was the proper thing. The difference in the capacity of the two plants is a fraction over 20%." To show that the increase in price was grossly excessive as supporting their inference of a fraudulent scheme or device plaintiffs rely largely and wholly upon the testimony of this engineer yet in their briefs here plaintiffs say: "We shall not attempt to analyze the testimony of Mr. Henningson, engineer expert for plaintiffs covering the various differences in the engines from which he concludes that there is no justification for $4,377.52 of the increased price nor of Mr. Henrici, engineer for the city to the effect that the price was fair because of the increased efficiency." Nor shall we undertake to analyze the testimony of plaintiffs' expert engineer. It is somewhat involved, and technical. However, the witness stated that he had examined the two bids of the Fulton Company and made a comparison thereof; that "the first bid covered two 200 horse power engines . . . the (first) bid provided for an overload on these engines of 25% meaning that the engines would carry a load of 250 horse power. I did not find any guarantee that the two 240 horse power engines would carry any overload . . . The engines under bid two weigh 1120 pounds each, or a total of 2,240 pounds, more than the engines under bid one . . . Figured on the basis of price per pound, bid two should be increased $400.48. The larger engines increased the K. V. A. rating of the generator 74 K. V. A., making an additional cost. This increase is approximately $8.00 per K. V. A., or $592.00. The exciters are reduced from 10 K. W. to 8 K. W. and the 10 K. W. exciters cost approximately $400 more that the 8 K. W. exciters." As the writer understands the foregoing testimony the witness took into consideration that the first bid "provided for a 25% overload" on the 200 horse power engines "meaning that the engines would carry a load of 250 horse power" while the second bid did not provide that the 240 horse power engine carry any overload and that the only substantial difference in the engines was that the two 240 horse power engines weighed 2240 pounds more than the 200 horse power engines. He then proceeds to compute the difference in cost solely on a poundage basis; says that would amount to an increase in engine cost of $400.48; takes

into consideration variations in the cost of generator and exciters and concludes that an increase of but $592 in cost is justifiable. However, it appears that the second bid did contain the same proviso concerning a twenty-five per cent overload, in identical language, which the witness noted in the first bid, that "the engines develop 25% above rated horse power" and that such provision applied to the 240 horse power engine. The witness, as he subsequently admitted on cross-examination, had entirely overlooked such proviso in the second bid. Defendants' evidence was that there is no relation between the weight of an engine and its price and that the price of an engine is not computed upon a poundage or weight basis; that the increase in capacity of the plant under the second bid was 20.3 per cent and the increase in price 12 per cent and that the purchase price of the 240 horse power engines "figures $101.60 per horse power which was the lowest bid per horse power that was made." The first bid of the Fulton Company computed on horse power basis was $109 per horse power; the bids of a number of other companies bidding at that time varied from $104 to $124 per horse power. Witnesses for defendants testified that the purchase price of the engines and equipment fixed by the second bid was fair and reasonable. No witness testified that there was any scheme or understanding that the difference in the bids on the bonds should be refunded by the city by including the amount thereof in the purchase price of the engines and equipment. The city had employed the Henrici Lowry Engineering Company. That company designed and prepared the plans and specifications for the entire plant and advised and represented the city in all engineering matters in connection therewith. Mr. Herman C. Henrici, a consulting engineer with the engineering company, appears to have had a large experience in designing and supervising electric light and power plants both for municipalities and private companies. His testimony, if the basis for his conclusions be accepted, fully sustains the reasonableness of the purchase price fixed by the second bid. He stated that he recommended the increase in capacity which was made and after having in detail stated the basis of his finding said: "I considered that the price was fair and recommended that the city accept the proposition." Mr. L. O. Grantham, a member of the board of public works, called as a witness by plaintiffs, testified: "The Fulton Iron Works said they would see that the bonds were taken care of . . . I didn't know whether they were going to give some money to the Fidelity National to make up the difference . . . or whether they were going to buy them of the Fidelity National at par . . . . It was not any of our lookout . . . . Nothing was said between the Fulton Iron Works and the Board of Public Works that the only way they would take care of the bond situation was that we purchase a different engine. . . . I did not understand the price was hiked to take care of the difference

they would be out on the bonds. You count the horse power. The heavy engine is cheaper than the other. I understood they were so anxious to sell their engines they would take a loss on the bonds and thought it none of our business." The sales manager for the Fulton Company testified that the company would incur a loss on the contract but that the engines sold to the city were a new type developed by his company and the company "did not have any of this type installed in this part of the country. We figure it is better to take a job around here at a loss than to spend the same amount of money on national advertising."

We do not think that the evidence, as a whole, warrants a finding that, as charged, the purchase of the generating equipment of increased capacity was a fraudulent scheme or device resorted to by the city to circumvent the statutory prohibition that the bonds be not sold for less than par but tends rather to show that the contract with the Fulton Company was a bona fide purchase of the engines and equipment at a reasonable and fair price and that the purchase price agreed upon was the actual cash sale price. We are not here concerned as to the understanding between the Fulton Company and the Fidelity National Company to which it is not shown that the city was a party. We therefore defer to the finding of the trial court on this issue.

The other phase of this case has to do with the contract entered into by the city and the Fulton Company and the question presented is whether an indebtedness within the meaning of the constitutional prohibition of Section 12, Article 10 of our State Constitution was thereby created. The cash purchase price named in the Fulton Company's last bid, accepted by the city, was $48,840. It was agreed that the purchase price be paid in deferred monthly installments with interest included. A schedule of payments was prepared covering installments, including principal and interest, as follows: the first four months of the first year $250 monthly and $1150 monthly for the remaining eight months, the total for the first year being $10,200; the second, third and fourth years $1150 monthly, aggregating $13,800 for each year; the first three months of the fifth year $1150 and $958.49 for the fourth month being a total for that period of $4408.49 and completing the payments. The aggregate of the monthly payments for the full period of four years and four months is $56,008.49. The installments were to commence upon the completion, installation and acceptance of the plant for use by the city. A contract denominated as a lease was drawn and executed wherein the Fulton Company is referred to as the lessor and the city as the lessee and whereby the Fulton Company purports to lease the engines and other equipment to the city and the monthly installments are called rentals; the city covenanting to pay a monthly rent for the use

of the machinery according to the schedule of monthly installments set out. It is then provided that, "upon receipt of the total rentals herein provided for, at the expiration of the fifth year lease period and upon consideration of one dollar lessor will sell, assign and transfer the leased property to the lessee." Thus according to the form and language of the so-called lease if the city had paid all the monthly rentals the Fulton Company would at the end of the fourth month of the fifth year sell the city the engines and entire generating equipment for the sum of one dollar. The contract requires the city to carry various kinds and types of insurance upon the machinery "payable to the lessor" and, the title being reserved in the Fulton Company, that the city pay "any taxes that may be levied." The evidence computed the annual cost of the required insurance at approximately $1792 and that taxes would be approximately $1600. In the event of default in the payment of the installments the Fulton Company was given "full right to enter any buildings or premises where the machinery may be and remove the same . . . at the cost and expense of" the city including freight charges thereon to St. Louis, Missouri, or Springfield, Ohio. The city covenants "that the monthly net receipts of the City's Light Plant after the usual operating expenses including fuel oil, lubricating oil, operating labor and plant maintenance, have been taken out shall be applied first to the payment of the monthly rental provided herein . . . to establish a light plant fund entirely separate from the general fund" and make "payment of the monthly rental from the light plant funds. No funds of the city shall be liable for the payment of rentals hereunder by the city except the light plant fund" and "to credit the light plant with the equivalent of what would be charged other large consumers for all power and light used by the city." Pursuant to the terms of the contract the city enacted the following ordinance:

"Section 1. That all money received by the City of Stanberry, Missouri, for the sales and use of all electric current generated in the power plant of said city shall be segregated and designated as the Light Plant Fund.

"Section 2. That the electric current used by the City of Stanberry, Missouri, for street lighting, for white ways, for operating the city's water pump and/or for any other purposes, shall be paid for by the city of Stanberry, Missouri, at the same rate said city will charge any consumer using a like amount of electric current, and the money so paid shall be placed in said light plant fund.

"Section 3. That the city treasurer of the city of Stanberry, Missouri, is hereby authorized and directed to pay out of the said Light Plant Fund the monthly rentals as called for in the lease section of the contract."

Thus as the contract required it was provided that the city purchase from itself electric current and power used for street lighting,

white ways, operating the city's water pump and any other municipal purposes at the same rate charged any consumer using a like amount of electric current, and therefore presumably at a profit, and that the city pay such amount into the "Light Plant Fund," the net receipts of which were pledged first to the payment of the monthly installments to the Fulton Company. It was shown that the city had been paying approximately $2000 per year for street lights. In addition to the existing street lighting system the installation of "white ways" was contemplated which would doubtless increase the cost of street lighting and the city's water pumps were to be operated by electricity; all electricity so used was to be purchased by the city from itself at regular rates. The contract was consummated and the obligations thereunder incurred in the year 1929 and it appears that the annual "income and revenue" accruing to the general revenue fund of the city for the year 1929 was $11,577. While the annual "income and revenue" which might in subsequent years be provided or which would accrue to such fund, being dependent of course upon future property assessments, valuations and tax levies, could not be determined respondents say "it is fair to assume that the city would have available in the following years an amount approximately the same" as that for the year 1929. The writer is unable to determine with certainty the outstanding or existing indebtedness of the city at the time the contract was entered into with the Fulton Company. However, if that be important here, we will, for the purposes of this opinion adopt the computation thereof made by appellants, which we do not find controverted, that the "existing indebtedness" at the time, including the bond issue of $40,000, was $80,756. If the amount of the Fulton Company contract $56,008 be an indebtedness within the meaning of Section 12 of Article 10 of our Constitution then the total indebtedness of the city including the "existing indebtedness" would become $136,764. The amount of the assessment eligible as the basis for ascertaining the permissible limits of indebtedness which the city could incur under the provisions of Sections 12 and 12a of Article 10 of the Constitution is $886,970 so that "with the assent of two-thirds of the voters thereof voting at an election held for that purpose" the city, for the purpose of constructing an electric light plant, could have, at that time, incurred a maximum indebtedness, including existing indebtedness, in the amount of $133,045. While it appears that there was allowance within the limits of the constitutional limitations which would have permitted the city, with the requisite assent of two-thirds of the voters voting at the election, to incur an indebtedness and issue its bonds in an amount which would perhaps have been sufficient, on a cash basis, to construct the light and power system the city officials did not choose to handle the matter in that way but elected to purchase the engines and entire generating equipment in the manner above stated thereby incurring an

indebtedness or liability on the part of the city, in addition to the existing indebtedness, of $56,008 without any submission of such proposition to, and authorization thereof by, the voters of the city at an election.

As first stated the question which arises is was the indebtedness created by the contract with the Fulton Company an indebtedness of the city of Stanberry within the purview of said Section 12, Article 10, of our Constitution. Said Section 12 provides: "No . . . city . . . shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the consent of two-thirds of the voters thereof voting on such proposition, at an election to be held for that purpose; nor in cases requiring such assent shall any indebtedness be allowed to be incurred to an amount including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the assessment next before the last assessment for State and county purposes, previous to the incurring of such indebtedness." etc. Section 12a relates to and extends the limitation of permissible debt in certain cities and reads: "Any city in this State, containing not more than thirty thousand inhabitants, may, with the assent of two-thirds of the voters thereof voting at an election held for that purpose, be allowed to become indebted in a larger amount than specified in Section 12 . . . not exceeding an additional ten (10) per centum on the value of the taxable property therein, for the purpose of purchasing or constructing waterworks, ice plants, electric or other light plants to be owned exclusively by the city so purchasing or constructing the same," etc. Section 12, supra, provides two ways in which a city may become indebted; (1) it may, during any year, without a vote of the people, incur debts to an amount not exceeding the income and revenue provided for such year; (2) the consent of two-thirds of the voters of said city voting on such proposition at an election held for that purpose being first had it may become indebted in an aggregate amount, including existing indebtedness, not exceeding five per cent of its assessed valuation. However, the limitation fixed by Section 12 is extended as to cities of less than 30,000 inhabitants to "an additional ten per cent" of the city's assessed valuation when such indebtedness is "for the purpose of purchasing or constructing waterworks, ice plants, electric or other plants."

In an effort to distinguish this case and exclude it from the rule announced by our court, en banc, in Hight v. City of Harrisonville, 328 Mo. 549, 41 S. W. (2d) 155, and followed in Hagler v. City of Salem, 333 Mo. 330, 62 S. W. (2d) 751, respondents contend that this contract did not create a present indebtedness for the full amount thereof; that it is merely a lease providing for monthly rentals payable solely out of the receipts of the plant and that the only expendi-

tures which the city is required by terms of the contract to make from the general revenue fund of the city, raised by taxation, are insurance, taxes and payments at the regular rates to the special Light Plant Fund for electricity used for municipal purposes and that the total amount thereof annually would be well within the annual income and revenue reasonably expected to be provided with sufficient balance remaining to pay the necessary annual current expenses for the maintenance of the city government.

The evidence clearly shows that the city asked for and received bids for the purchase of the machinery included in the Fulton Company contract; that the city proposed to buy this machinery on the installment plan; that the Fulton Company's bid was accepted and it was agreed and so understood by the city officials and the representatives of that company that the purchase price of the machinery with interest be paid in monthly installments over a period of 52 months with title reserved in the vendor until the machinery was paid for. The so-called lease designating the monthly installments as rentals is a patent attempt to disguise the true character of the transaction. The facts and events which we have heretofore stated suffice to demonstrate that it was not a bona fide lease but in legal effect a purchase and sale of the machinery on the installment plan creating a present indebtedness for the full amount payable in deferred monthly installments. It is said in 19 Ruling Case Law at page 984: "The purchase of a single public improvement by installments which in the aggregate exceed the debt limit cannot be accomplished by calling the installments rent, if there is a binding obligation to pay them for a definite period and upon the payment of the last installment title to the property passes to the municipality, or by pledging the municipality's good faith for the payment of the installments when it is recognized that there can be no legal liability, if it is provided that if any installment is unpaid title to the entire property shall revert to the contracting party." This device of clothing a sale and purchase, whereby the purchase price is to be paid in installments, in the guise of a lease and denominating the installments as rentals with a view to thereby circumventing constitutional and statutory debt limitations has been frequently attempted. We shall not undertake to here marshal the authorities other than cite and refer to a few of the numerous cases which are very similar to the instant case on the facts. In Jones v. Rutherford, 225 Ky. 773, 10 S. W. (2d) 296, the city of Corbin, Kentucky, owned and operated a municipal water and light plant. Concluding that the plant was inadequate the board of commissioners took steps to install an additional electrical power unit. They were unable, however, to purchase same without exceeding the constitutional limitations of municipal indebtedness. They entered into an agreement with the seller denominated a lease whereby the machinery was delivered to and installed by the

city and the city agreed to pay stipulated monthly rentals for twenty-five months at the end of which term the city was to have the right, if all rentals had been fully paid, to purchase the machinery at an agreed price of $1. The court said: "It is clear that under the proposed contract the city assumes an obligation to pay the entire contract price of the machinery. This obligation constitutes a present indebtedness within the meaning of Section 157 of the Constitution, and in an amount forbidden by that section. Being a present indebtedness, the effect of the constitutional provision cannot be avoided, by providing for installment payments running through a series of years." In Earles v. Wells, 94 Wis. 285, 68 N. W. 964, a contractor agreed to construct a waterworks plant and lease it to the city for a stated term; the city was to operate the plant, keep it in repair, pay taxes accruing thereon and pay the stipulated rentals for the term of the lease and at the termination of the lease, if all rentals provided for had been paid, the plant was to become the property of the city. It was held that a present indebtedness exceeding the constitutional limitation was created, the court saying: "The method by which the attempt was made may be regarded as ingenious, but it should be remembered, . . . that the city could not do by indirection what it could not do directly." A like case is found in Spilman v. City of Parkersburg, 35 W. Va. 605, 14 S. E. 279. There an electric company agreed to erect and equip an electric plant for the city and then lease it to the city for a term of five years, the city to pay a stipulated sum quarterly as rental with the right at the expiration of the term of the lease, if all rentals had been paid, to buy the plant for the sum of $1. It was held that the agreement was a contract of purchase creating a present indebtedness within the meaning of the constitutional limitation of indebtedness. Some of the other cases to the same effect are: Hall v. Cedar Rapids, 115 Iowa, 199, 88 N. W. 448; City and County of San Francisco v. Boyle, 195 Cal. 426, 233 Pac. 965; Reynolds v. Waterville, 92 Me. 292, 42 Atl. 553; Mahoney v. San Francisco, 201 Cal. 248, 257 Pac. 49; Baltimore & Ohio S. W. Railroad Co. v. The People, 200 Ill. 541, 66 N. E. 148; Hively v. School City of Nappanee, 202 Ind. 28, 169 N. E. 51; Renfroe v. City of Atlanta, 140 Ga. 81, 78 S. E. 449; Brewster v. Deschutes County, 137 Ore. 100, 1 Pac. (2d) 607; Williams v. City of Emmett, 51 Idaho, 500, 6 Pac. 475; Garrett v. Swanton, Mayor, 216 Cal. 220, 13 Pac. (2d) 725. An American Law Report Annotation (71 A. L. R. 1323) says in substance that "the weight of authority holds that such a scheme," as we have under the facts of the instant case, creates a present indebtedness for the whole or aggregate amount "where the so-called rentals are sufficient to cover the entire purchase price and to enable the municipality to acquire the property without the payment of any sum other than such rentals." This essential and costly machinery constituting the entire generating

equipment was to be delivered, and turned over, to the city all at one time, installed upon permanent foundations constructed especially therefor, connected with other parts of the system and made an integral part of the municipal electric light and power system. This is a situation covered by the rule found at 44 Corpus Juris, page 1130, relating to indebtedness of municipal corporations, that "a contract for the purchase or construction of a public utility plant or for the purchase of other property, the consideration being received in the present and all at one time, creates an indebtedness for the full amount of the contract price, notwithstanding the price is to be paid in installments during a series of years or an attempt is made to avoid a debt limitation by contracting in form to pay rental" and, at page 1135 (44 C. J.), "notwithstanding an arrangement for yearly payments or expenditures by the municipality, an indebtedness for the aggregate amount of the payments is deemed to be incurred during the year when the contract is entered into where the entire consideration is received at that time, as where, despite its form, the transaction is really a purchase of property." We are therefore constrained to hold that an indebtedness for the full or aggregate amount of the installments was incurred at the time the contract was entered into. [Trask v. Livingston County, 210 Mo. 582, 109 S. W. 656.]

But respondents, invoking and relying upon the special fund doctrine, contend that though it be held to be an indebtedness for the full or aggregate amount of the installments that nevertheless it is not an indebtedness within the meaning of that term as used in Section 12, Article 10 of our Constitution. The special fund doctrine is recognized in this State, i, e., that a city does not create an indebtedness within the contemplation of the constitutional proviso by obtaining or purchasing property which is to be paid for solely and exclusively from a special fund derived from the income of the property with no liability on the part of the city to pay such purchase price or any part thereof directly or indirectly with funds raised by taxation or from a fund which must be replenished by funds raised by taxation. [State ex rel. City of Hannibal v. Smith, 335 Mo. 825, 74 S. W. (2d) 367; Bell v. City of Fayette, 325 Mo. 75, 28 S. W. (2d) 356; Hight v. City of Harrisonville, supra; Hagler v. City of Salem, supra.] The Supreme Court of California in Garrett v. Swanton, supra, points out that the special fund doctrine is, however, confined within certain defined limits, saying: "Thus it is well established that an indebtedness or liability is incurred when by the terms of the transaction, a municipality is obligated directly or indirectly to feed the special fund from general or other revenues in addition to those arising solely from the specific improvement." And we so held in the Harrisonville and Salem cases; the rule there announced is that an indebtedness is created within the purview of the constitutional provision when the debt which the

city incurs is "to be paid directly or indirectly, in whole or in part, from funds raised by taxation, or from a fund which must be replenished by funds raised by taxation." By the contract with the Fulton Company, and ordinances enacted in conformity therewith, the city of Stanberry obligates itself to purchase all electricity used by it for street lighting, its proposed white way system, operating its waterworks and any or all other municipal purposes, from itself paying therefor into the special fund provided for at the regular or same rates charged other consumers. It is conclusively shown that such payments into the special fund will and must come, no other provision being made therefor, from funds raised by taxation so that upon the facts the case comes within, and is governed by, our ruling in the Harrisonville and Salem cases.

Since it appears that the contract with the Fulton Company creates a present indebtedness, for the full amount thereof, within the meaning of that term as used in Section 12, Article 10, of the Constitution; that said indebtedness exceeds the income and revenue provided for the year; that it was not submitted to or authorized by the voters of said city and that in fact the full amount of said indebtedness added to the prior existing indebtedness of the city would create a total indebtedness, on the part of the city, in excess of the amount permitted by the Constitution even with the assent of the voters, petitioners' prayer that the performance of said contract between the defendants, City of Stanberry and Fulton Iron Works Company be enjoined and restrained should be granted. The judgment of the circuit court is therefore reversed, the cause remanded, and that court directed to enter a decree and judgment in conformity herewith. *Sturgis* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.