JOHNS–MANVILLE CORPORATION,
Plaintiff-Appellee,

v.

VILLAGE OF DeKALB, MISSOURI,
et al., Defendants,

Amos H. Watts et al., Defendants-
Appellants.

No. 20342.

United States Court of Appeals,
Eighth Circuit.

March 12, 1971.

R. H. McRoberts, Thomas C. Walsh, W. H. Utz, Jr., Franklin T. Thackery, St. Joseph, Mo., for defendants-appellants; Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., Smith, Utz, Litvak & Thackery, St. Joseph, Mo., of counsel.

Howard F. Sachs, Joseph J. Kelly, Jr., Gad C. Smith, Kansas City, Mo., for plaintiff-appellee, Johns-Manville Corp.; Spencer, Fane, Britt & Browne, Kansas City, Mo., of counsel.

Before GIBSON and BRIGHT, Circuit Judges, and McMANUS, Chief District Judge.

GIBSON, Circuit Judge.

This is an interlocutory appeal[1] from a declaratory judgment entered by the United States District Court for the Western District of Missouri, holding that $505,000 principal amount of waterworks revenue bonds issued and sold by the Village of DeKalb, Missouri, are "invalid, null and void, and of no force and effect."

The alignment of the parties in this case is highly unusual. The suit was commenced as a declaratory judgment action in the Circuit Court of Buchanan County, Missouri, on April 22, 1968, by plaintiff, Johns-Manville Corporation, the current holder of the DeKalb waterworks revenue bonds. Plaintiff joined as defendants the Village of DeKalb and all parties and sureties who were in any way involved with the issuance of the bonds or the construction of the waterworks. The appellants in this Court are the 30 partners of the Chicago, Illinois law firm of Chapman and Cutler. Chapman and Cutler was joined as a defendant because it had issued a legal opinion that the municipal proceedings showed lawful authority for the issuance of the bonds by the Village and that the form of the bonds revealed them to be valid and legally binding special obligations of the Village, payable from waterworks revenue only. Upon motion by defendant Chapman and Cutler, predicated on diversity of citizenship, the case was removed to the federal district court under 28 U.S.C. § 1441(c).

Plaintiff's Complaint sought a declaratory judgment as to the validity of the waterworks revenue bonds and requested specified relief against certain defendants in the event of a finding of validity and, alternatively, prayed for relief against other defendants, including Chapman and Cutler, if the bonds should be determined to be invalid. The Answer filed by the Village neither admitted nor denied the validity of the bonds. Thus, we have a bondholder challenging the validity of bonds it holds when the issuer of the bonds has not denied their validity.

The District Court severed for trial the issue of the bonds' validity, reserving all other issues for later determination. This issue was tried to the Court without a jury on June 23–24, 1969, and the Court filed its unreported Memorandum Opinion on April 24, 1970. The District Court concluded that the Village of DeKalb was without legal authority to construct, operate and own the proposed waterworks

---

1. The District Court, the Honorable Richard M. Duncan presiding, was of the opinion that its order involved a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal might materially advance the ultimate termination of this litigation and certified the case for interlocutory appeal under 28 U.S.C. § 1292(b) in its judgment entry of May 18, 1970. On June 9, 1970, this Court granted leave to appellants to prosecute this interlocutory appeal.

system, which was to include transmission facilities to be used for the purpose of supplying a substantial number of customers outside the corporate limits of the Village. The Court held that the validity of revenue bonds is dependent upon the validity of the project financed since it is the income from that source which will go to meet the outstanding indebtedness created by the bonds, and, consequently, concluded that the waterworks revenue bonds issued by the Village of DeKalb are invalid.

The facts surrounding the authorization and issuance of the bonds are basically not in dispute. In April 1962 a substantial number of buildings in the Village of DeKalb were destroyed by fire, primarily because the Village did not have a water system. Shortly thereafter, Village officials began to investigate the possibility of obtaining a water system for the Village. They came in contact with defendant Harold D. Audsley who offered to secure a waterworks system to supply the Village. Audsley acted as principal promoter of the project while defendant Richard C. Lamb, an engineer, served as Audsley's assistant and was responsible for the engineering and construction aspects of the project.

Research and testing indicated that a supply of good quality water in sufficient quantity did not exist in or close to the Village. The nearest adequate supply of water was located in the Missouri River bottoms immediately to the west of the Village of Rushville, a straight-line distance of approximately six miles. It was obvious that the Village of DeKalb with about 300 inhabitants could not support a system of the type needed to transport water from that low an elevation and over that distance. Due to these economic realities, engineer Lamb drew up plans for a waterworks system which would serve not only the Village of DeKalb, but also the incorporated Village of Rushville, the unincorporated communities of Sugar Lake and Winthrop, and certain adjacent farm areas. Rushville is located five miles west of DeKalb, Sugar Lake is seven miles southwest, and Winthrop is ten miles west southwest. The proposed project encompassed an area of approximately 33 square miles, contained more than 40 miles of water transmission lines and included approximately 550 potential customers [2] (about 300 of whom were residents of DeKalb). Another advantage to this "loop" system was to insure that in the event of a breakdown in one line of supply, the other would still be operative.[3]

On March 8, 1963, the Board of Trustees of the Village passed an ordinance calling an election for the purpose of voting on the question of the issuance of revenue bonds in the principal amount of $505,000 for "the purpose of constructing a waterworks to be owned exclusively by said Village." Prior to the bond election, an 8-page promotional distribution sheet bearing the title "Facts About the Proposed Water System for DeKalb and Buchanan County Residents" was circulated among the residents of the area to be served. This unsigned circular advocated passage of the ordinance and contained a map of the proposed extraterritorial system and a copy of the "Notice of Special Election" issued by the Village Clerk.

In a special election held April 2, 1963, the voters of the Village adopted the proposed ordinance. Plans for the proposed system were then submitted by Lamb to the Missouri Division of Health, which approved the project design on June 10, 1963. On January 7, 1964, the Board of Trustees, pursuant to the authority derived from the election, enacted a bond ordinance authorizing the issuance of revenue bonds in the principal amount of $505,000 "for the purpose of paying the costs of constructing a waterworks for said Village."

2. The estimated number of customers necessary to provide sufficient revenue to operate the system and retire the bonds.

3. One other proposal apparently was considered and rejected. It likewise was a "loop" arrangement with the wells located at Sugar Lake, but Rushville and Winthrop were eliminated from the system.

The Village issued and sold the bonds to Audsley on September 3, 1964, who purchased the bonds with money borrowed from defendant Merchants Produce Bank, pledging the bonds as security. At that time Audsley received certain fees in connection with his services concerning the bond sale and its financing. On September 14, 1964, a construction contract was let by the Village to the Mohawk Construction Company. On November 20, 1964, Johns-Manville purchased the entire issue from Audsley, allegedly relying upon the opinion letter issued by Chapman and Cutler on September 25, 1964, that the bonds were legally valid revenue obligations.

Construction was begun on the project but the system was never placed into operation since the bond proceeds were depleted before the project was fully completed. The Village did make several semi-annual interest payments to Johns-Manville from the bond proceeds, but at the present time interest payments on the indebtedness have been in default for several years.

When the system was 70 per cent completed and approximately $425,000 had been expended, a suit seeking a declaratory judgment on the validity of the bonds and the construction contracts was heard in the Circuit Court of Buchanan County, Missouri. The suit was brought by Elbert F. Spencer, a resident, property owner and taxpayer in the Village of DeKalb. The state trial court, relying on Taylor v. Dimmitt, 336 Mo. 330, 78 S.W.2d 841 (1934), held that the Village did not have the statutory authority to construct an extraterritorial waterworks system to supply neighboring communities, and, therefore, the revenue bonds issued to finance this sytem and all subsequent action taken for this purpose were in excess of its corporate power and null and void. On November 26, 1965, the State Court enjoined the Village from further construction of the waterworks system and from paying any sums on the bonds or to the construction company or the engineers. On appeal, the Supreme Court of Missouri, on November 14, 1966, reversed the trial court on the ground that the plaintiff lacked standing to sue because he did not have a legally protectible interest at stake, reasoning:

"In view of the fact that the revenue bonds in evidence provide that neither they nor the interest thereon shall be paid in whole or in part out of funds raised by taxation, the fact that plaintiff is a taxpayer is not sufficient *of itself* to show plaintiff could have been adversely affected by the actions of the Village of DeKalb." Spencer v. Village of DeKalb, 408 S.W.2d 78, 80–81 (Mo. 1966).

On April 22, 1968, plaintiff Johns-Manville filed the instant suit in the Circuit Court of Buchanan County, Missouri, which, as explained above, was removed under 28 U.S.C. § 1441(c) to the federal district court. The District Court found that the only water system planned at the time of the bond election, the one described above, was illegal. The Court further found that that specific water system was represented in a pre-election circular to the inhabitants of the area to be served as the system which would be built from the proceeds of the bond issue if the bond issue passed. Although neither the Village Board of Trustees nor the Village voters ever expressly adopted or approved any particular waterworks plan prior to the bond election, and the ordinance calling the election, the election ballot, the ordinance authorizing the issuance of the bonds, and the bonds themselves all stated in general terms that the bonds would be issued "for the purpose of constructing a waterworks to be owned exclusively by said Village," the Court held that the validity of the revenue bonds is dependent upon the legality of the contemplated project[4] to be financed by bond pro-

4. The panel is in disagreement as to whether it should pass on the legality of the project which was partially constructed. Judge Gibson is of the view that the District Court was correct in finding the project illegal under the pertinent Missouri statutes and case law, particularly Taylor v. Dimmitt, 336 Mo. 330, 78 S.W.

ceeds and expressly rejected the argument that the validity of the bonds is determined solely by the regularity of the bond authorization and issuance process.

We note at the outset that neither the Village nor any of its officials have questioned the validity of the revenue bonds or have sought to avoid payment by reason of any irregularity in the bonds. The regularity of the ordinance calling the election and the election is not disputed, and the District Court found those proceedings to be in compliance with Missouri law. Plaintiff pleaded that it had no notice of any irregularities in these bonds when it purchased them and no party has contested the fact that plaintiff's acquisition of the bonds was in good faith. Consequently, there exists an unrebutted presumption that plaintiff should be accorded the status of a bona fide purchaser for value.

The question then presented is whether the validity of revenue bonds, which have been issued and are held by a bona fide purchaser for value, is to be determined by the validity of the contemplated project to be financed by the proceeds from the bonds when that specific project is not referred to in any of the municipal ordinances or proceedings related to the

bond election or issuance, but where representations as to the specific project were made to the Village residents prior to the bond election and a specific project plan was later submitted by the Village to the Missouri Division of Health and approved by the Division prior to the issuance of the bonds.

 Having stated the issue, we feel it advisable to comment that this case reflects how critical is the timing of litigation challenging the validity of municipal bonds or the expenditure of bond proceeds. Were the bond proceeds unexpended at this juncture, this case might have a completely different posture for the expenditure of funds on an illegal project obviously can be enjoined. But those facts unfortunately are not before us for the bonds have been issued and the proceeds spent.[5] In light of these realities, our resolution of the issue in the instant case must be guided by the sound principle laid down long ago by the Missouri Supreme Court that legal defects which might have application in a proceeding to prevent the issuance and negotiation of municipal bonds will not be allowed to authorize the repudiation of bonds which have come into the possession of bona fide holders.[6] Rose v.

2d 841 (1934). Judges Bright and McManus would not decide the legality of the Village's contemplated project in this interlocutory appeal since it is not, as will be subsequently shown, necessary to our decision and because the Missouri Supreme Court declined an explicit invitation to declare the project illegal in Spencer v. Village of DeKalb, 408 S.W. 2d 78 (Mo.1966). They also express doubt that *Taylor, supra,* applies to a project for an initial construction of a waterworks system such as in this case.

5. The law is clear that a bond issue will not be invalidated because of the misuse of the bond proceeds, so long as the purpose for which the bonds were issued was a valid one. Blanchard v. Village of Benton, 109 Ill.App. 569, 576–577 (1903); Volusia County v. Florida, 98 Fla. 1166, 125 So. 375, 380 (1929); Westbrook v. Town of Southern Pines, 215 N.C. 20, 1 S.E.2d 95, 97 (1939). The purchaser of municipal bonds is not required to see to the proper application of the proceeds

of the bond sales; hence, it is no defense that the proceeds were improperly applied or used for an unauthorized purpose. St. Paul Fire & Marine Insurance Co. v. Town of Monongah, 209 F. Supp. 514, 517 (N.D.W.Va.1962) (revenue bonds); Town of Clifton Forge v. Alleghany Bank, 92 Va. 283, 23 S.E. 284, 285 (1895); Hightower v. City of Raleigh, 150 N.C. 569, 65 S.E. 279, 281 (1909); 15 E. McQuillin, Municipal Corporations § 43.68 at 607 (3d ed. 1970).

Consequently, the fact that the bond proceeds in the instant case were used in an attempt to implement a waterworks plan which may have been in part ultra vires has no bearing on the validity of the revenue bonds.

6. Indeed, as defendants point out, extension of this policy has lead to general recognition of a principle of estoppel in favor of bona fide purchasers where municipalities issue bonds containing recitals of compliance with governing constitu-

Springfield & Brookline Special Road Dist., 275 Mo. 590, 205 S.W. 54, 56 (1918); Steines v. Franklin County, 48 Mo. 167, 175–176, 8 Am.Rep. 87 (1871). It has also been held that where the municipality has repeatedly recognized the validity of its bonds and has paid interest on them for a series of years, as in the instant case, all questions of doubt in relation to their validity should be answered in favor of their legality. Portsmouth Savings Bank v. City of Springfield, 4 F. 276 (C.C.S.D.Ill.1880). *See also* Rose v. Springfield & Brookline Special Road Dist., 275 Mo. 590, 205 S.W. 54, 56 (1918); Steines v. Franklin County, 48 Mo. 167, 175–176, 8 Am.Rep. 87 (1871); County of Clay v. Society for Savings, 104 U.S. 579, 591, 26 L.Ed. 856 (1881); Atchison Board of Education v. De Kay, 148 U.S. 591, 601, 13 S.Ct. 706, 37 L.Ed. 573 (1893).

There is a dearth of case law on the precise question of whether we look beyond the stated purpose in the ordinances and municipal proceedings to the contemplated project in making a determination on the validity of revenue bonds. The rule in Missouri with regard to general obligation bonds seems to be that the court should not look beyond a general statement of public purpose in the pertinent ordinances unless they contain a specific reference to a particular plan or project.

State ex rel. Clay County v. Hackmann, 270 Mo. 658, 195 S.W. 706 (En banc 1917), involved a mandamus proceeding to compel the state auditor to register a portion of a proposed public road bond issue of Clay County. The Missouri Constitution removed the debt limitation which counties could incur with the consent of the voters when such indebtedness was incurred for road purposes, provided that the order contained, among other

things, a recital that the proceeds were to be used for the improvement of the public roads of the county. The recital in the order referred to "the said public roads" of Clay County. The Court held:

"If * * * the county court had contended [sic] itself with merely following the language of the statute, all would agree in saying that the order was good. The county court, however, did not content itself with following the exact language of the statute, but it recited in said order that the proceeds are to be used for the improvement of 'said public roads of said county,' and the word 'said,' by the language of the order itself, *clearly refers to the roads shown by the plat presented by the petitioners and now on file with the county clerk, a copy of which, by stipulation, is now before us.*" *Id*. at 708.

Consequently, the Court did look at the proposed roads as set forth on the plat and held that they did qualify as "public roads" within the constitutional meaning.

A few years later, in State ex rel. Ray County v. Hackmann, 295 Mo. 417, 245 S.W. 554 (En banc 1922), the validity of general obligation bonds was challenged on the ground that the use proposed to be made of the proceeds was unauthorized. Although the Court did ultimately find that the contemplated use was a valid purpose on the merits (since apparently there were pending suits in the trial court challenging the expenditure of the bond proceeds on a particular project), the Court stated that it could "properly dispose of the case without a consideration of the use to be made of the proceeds on the ground that the use of the proceeds does not affect the validity of the bond issue, if a legal and proper purpose is stated in the proceedings, and

tional and statutory provisions made by the municipal authorities entrusted with determining such compliance, with the qualification that the municipality have the power to issue the bonds. Chaffee County v. Potter, 142 U.S. 355, 12 S.Ct. 216, 35 L.Ed. 1040 (1892); Anthony v.

County of Jasper, 101 U.S. 693, 25 L.Ed. 1005 (1879). Missouri, however, does not follow this rule. Smith v. County of Clark, 54 Mo. 58, 71 (1873). *See also*, 15 E. McQuillin, Municipal Corporations § 43.100 (3d ed. 1970), and cases cited therein.

constitutes no defense in an action to compel the registration of the bonds." *Id.* at 556.

The case of Sager v. City of Stanberry, 336 Mo. 213, 78 S.W.2d 431 (1934), involving the validity of what apparently were general obligation bonds, provides further support for the proposition that a bond issue is valid when there is a proper statement of purpose in the pertinent ordinances even though the contemplated usage of the proceeds is illegal. *Sager* was a taxpayers' suit to enjoin a sale by the city of a bond issue for a municipal electric lighting plant and to enjoin the carrying out of a contract entered into between the city and a private company for the lease or purchase of Diesel engines and generating equip-

ment. Although the Court did enjoin performance of the contract because it would result in a total municipal indebtedness in excess of the constitutional debt limitation, the Court did not invalidate the bond issue or restrain the sale of the bonds. The stated purpose of the bonds was set forth in broad, general and unrestrictive terms and no specific plan was adopted by ordinance either as a part of the election procedure or in the issuance of the bonds.[7]

The *Sager* holding that the validity of general obligation bonds will be determined solely by the propriety of the general statement of public purpose in the pertinent ordinances (except when specific reference is made to the contemplated project) is most significant[8] because

7. That these bonds contained a general statement of purpose is brought out in Missouri Service Company v. City of Stanberry, 341 Mo. 500, 108 S.W.2d 25, 28 (1937), which involved a taxpayers' suit to enjoin the performance of a later construction contract entered into by the City of Stanberry on the ground that performance of the contract would constitute a misapplication of the same bond proceeds because only the initial project (as set forth in the contract that formed the basis of the *Sager* suit) had been supposedly approved by the voters. (The validity of the bonds was not questioned in this suit.) The Court refused to enjoin expenditure of bond proceeds on the challenged contract as it held inadmissible testimony that the public understood a particular plan was meant because no specific plan was made part of the election procedure and there was no charge that the city authorities had any purpose to mislead the voters and the voters were not adversely affected by the improvements made.

8. Two recent Missouri Supreme Court cases provide further support for this view. St. Louis County v. State Highway Commission, 409 S.W.2d 149 (Mo.1966) was a declaratory judgment action brought to determine if funds derived from general obligation bonds issued for the construction of "highways within said county" could lawfully be appropriated to acquire the right of way for a highway which was not one of the expressway routes specifically included in the bond issue authoriza-

tion as voted by the electorate of the county. The trial judge ruled that the funds could not be expended on the proposed highway because this was not within the general purpose of the bond issuance, relying strongly on a 113-page "Fact Book" circulated by the St. Louis County Citizens Bond Issue Campaign Committee for its interpretation of the purpose of the bond issue. This ruling was reversed on appeal. The Missouri Supreme Court stated:

"We find no culpable misstatements in the Fact Book; however, we need not discuss its contents or the trial court's comments thereon because it has been specifically held that statements and representations made before an election held to vote on a constitutional amendment authorizing a bond issue for highway purposes are neither conclusive nor persuasive evidence on the courts when called on to construe a particular proposition adopted.

\* \* \* \* \*

"We hold that the intention and purpose of Proposition No. 1 was to embrace and specify expressways as one of the kinds of highways for which the funds provided could be used; the inclusion and specific mention of certain expressway routes did not have the effect of limiting the term 'highways within said County' or convert and dedicate the proceeds of the bonds sold solely to the construction of expressways. Designation of the proceeds as the 'Expressway Funds' did not change their

a holding to the contrary would not have required the Court to invalidate bonds which had already been negotiated. Had the Court ruled that the bonds were invalid because the proceeds were to be spent on an illegal project it could have done so relatively painlessly since the bonds had not yet been sold and the sale could have been enjoined.

▮ If these principles which apply to general obligation bonds are equally applicable to a determination on the validity of revenue bonds, the Village of DeKalb waterworks revenue bonds are valid for the ordinances and ballot do state a proper general purpose and no mention is made of any specific plan or project. We perceive no reason for a distinction between general obligation and revenue bonds on this issue. The case law, while not abundant, supports this position. See State v. Florida State Turnpike Authority, 134 So.2d 12 (Fla.1961); Spencer v. Mayor & Board of Aldermen of Yazoo City, 215 Miss. 160, 60 So.2d 562 (1952). The following statement by the Mississippi Supreme Court in *Spencer* is particularly pertinent:

> "If the bonds are issued and any question should arise as to the validity of the expenditure of the funds, proper remedies may be invoked to restrain any unlawful expenditure of the funds." *Spencer v. Bd. of Aldermen,* 60 So.2d at 566.

Plaintiff cites City of El Campo v. South Texas National Bank of San Antonio, 200 S.W.2d 252, 256 (Tex.Civ.App. 1946), for the proposition that valid ownership of a revenue-producing source is an "essential prerequisite to the practical validity or enforcibility of revenue bonds." It is pointed out that unless there is a lawful revenue-producing project, revenue bonds are merely unsecured pieces of paper; in contrast, general obligation bonds constitute a valid governmental obligation even though there may be collateral issues relating to the use of the proceeds.

We take no exception to these comments but they have no bearing on the question before us. The lone case cited by plaintiff which provides tacit support for its position, Williamson v. City of High Point, 213 N.C. 96, 195 S.E. 90 (1938), does not reach the question of whether the validity of revenue bonds which have been issued and negotiated to a bona fide purchaser for value is to be determined by the legality of the contemplated project when the pertinent ordinances and election proceedings state a proper public purpose and no particular project is specified.

▮ Furthermore, there are important policy reasons which militate against determining the validity of revenue bonds on the legality of the contemplated project when no particular project is specified in the ordinances calling the election, the ballot, the ordinances authorizing the issuance of the bonds, or the bonds themselves. First, such a rule

---

essential character." *Id.* at 152–153.

In Kansas City v. City of Raytown, 421 S.W.2d 504 (Mo. En banc 1967), Kansas City brought a declaratory judgment action against Raytown with reference to a cooperative sewer agreement executed by the two cities. Raytown was attempting to prevent the proceeds from a sewer bond issue from being used to construct the cooperative sewer system on the ground that since the ordinance, election notice and ballot language made no reference to the cooperative agreement, the proceeds cannot be used to carry out that program. The Court rejected this argument and held that "there is nothing in the ordinance, notice or ballot to prevent use of the bond proceeds for the purpose of building the facilities which Raytown agreed to build under the terms of the cooperative agreement." *Id.* at 512. The Court further noted:

> "If Raytown's premise were sound, the funds could not be used at all because no specific plan or location is specified. Such argument overlooks the fact that usually such bond proposals are in general language and leave to legislative discretion of the Council the exact location and particular projects upon which the funds will be expended." *Id.* at 511.

would seriously retard the marketability of revenue bonds. This reality was recognized long ago in Town of Clifton Forge v. Alleghany Bank, 92 Va. 283, 23 S.E. 284, 285 (1895):

> "If the bona fide purchaser of municipal bonds were bound, at his peril, to determine before buying (what is often a difficult and perplexing question to decide) whether the use proposed to be made of the proceeds by the corporation is lawful or not, the facility for transfer, which is one of the chief advantages belonging to this species of property, would be destroyed, and there would be little demand for such securities on the market."

Secondly, while a specific plan or plans are frequently developed prior to bond elections and prior to the issuance of the bonds, it is not uncommon for such plans to be changed as the planning progresses. Adoption of the rule urged by plaintiff would create substantial uncertainty as to the validity of all revenue bonds issued when a final plan had not been decided upon prior to the issuance of the bonds. It could also severely limit the legislative discretion of municipal governing bodies when the municipality was contemplating a specific project at the time of the bond election, for should a change in project plans be deemed desirable following the bond election, it would seem to follow that a new election would be necessary to validate the change. It is obvious that very few bondholders would be willing to undertake the policeman's role such a rule would require.

■ A court determining the validity of revenue bonds must look to the statements of public purpose in the ordinance calling the election, the election ballot, the ordinance authorizing the bond issuance, and the bonds. In the instant case, all of these legal documents contained proper general statements of public purpose and made no reference to a specific contemplated project. Consequently, the unsigned pre-election circular which included a map of a specific project and the specific project plan submitted by the Village to the Missouri Division of Health and approved by the Division prior to the issuance of the bonds are both immaterial to our consideration of the validity of the bonds in question. While this is dispositive of the question before us, because this area is so uncharted, we think it advisable to add that had the ordinance authorizing the issuance of these bonds referred to the plan submitted to the state Division of Health, the validity of the bonds would have turned on the legality of the specific project submitted. In instances where the ordinance calling the election and the election ballot set forth general statements of a valid public purpose but the ordinance authorizing the bond issuance or the bonds themselves contain a reference to a specific project, we think that for the purpose of determining the validity of the bonds, the legality of the specific project would be the controlling factor. If invalid, then the bonds would be invalid. But that is not the situation in this case.

Although the Uniform Commercial Code has no application in this case since the DeKalb bonds were issued and purchased by plaintiff prior to July 1, 1965, the effective date in Missouri of the Code, we note that our conclusion is in accord with § 8–202(2) of the Code which provides:

> "(a) A security other than one issued by a government or governmental agency or unit even though issued with a defect going to its validity is valid in the hands of a purchaser for value and without notice of the particular defect unless the defect involves a violation of constitutional provisions in which case the security is valid in the hands of a subsequent purchaser for value and without notice of the defect.

> "(b) The rule of subparagraph (a) applies to an issuer which is a government or governmental agency or unit

only if either there has been substantial compliance with the legal requirements governing the issue or the issuer has received a substantial consideration for the issue as a whole or for the particular security and a stated purpose of the issue is one for which the issuer has power to borrow money or issue the security." 20C V.A.M.S. § 400.8–202(2).

Consequently, the DeKalb bonds would be valid in the hands of Johns-Manville under the UCC though they contained a defect going to their validity if (a) there was substantial compliance with the legal requirements governing the issuance of the bonds or if (b) the Village had received substantial consideration for the issue and a stated purpose of the issue was for a proper municipal purpose. The bonds in question would be valid under both tests. First, the ordinance and election procedures related to the issuance were in precise compliance with all legal requirements. Secondly, the Village received full value for the bonds and the "stated purpose of the issue" was "for the construction of a waterworks to be owned exclusively by the Village," a proper purpose for the issuance of revenue bonds by a village in Missouri.

We conclude that the validity of revenue bonds is to be determined by examining the proceedings by which the bonds are authorized and issued, as shown by certain specific documents required to be kept by law, and the public purpose of the bond issue will be determined from the stated purpose in the pertinent ordinances except where reference is made to a specific contemplated project. Since the ordinances and election procedures were unquestioned, a proper general statement of public purpose was made in the bonds and ordinances in question, and no reference was made to a specific contemplated project, we find the waterworks revenue bonds issued by the Village of DeKalb to be valid.

The case is reversed and remanded for proceedings consistent with this opinion.