**KANSAS CITY, Missouri, a Municipal Corporation, Plaintiff-Respondent,**

**v.**

**CITY OF RAYTOWN, Missouri, a Municipal Corporation et al., Defendants-Appellants.**

**No. 52966.**

Supreme Court of Missouri, En Banc.

Nov. 27, 1967.

Rehearing Denied Dec. 21, 1967.

Herbert C. Hoffman, City Counselor, Richard W. Mason, Jr., Associate City Counselor, Kansas City, for respondent.

Walter A. Raymond, Raymond, West & Strader, Kansas City, and Richard T. Cole, Raytown, for defendants-appellants.

FINCH, Judge.

Kansas City brought a declaratory judgment action against the City of Raytown, its Mayor and City Council members (herein collectively referred to as Raytown) with reference to a cooperative sewer agreement previously executed by the two cities. An answer and a reply were filed, and then plaintiff and defendants each filed a motion for summary judgment. The trial court denied defendants' motion for summary judgment and entered summary judgment for plaintiff, from which Raytown has appealed. We have jurisdiction because the amount involved exceeds $15,000.

The agreement in question was executed by Raytown on November 5, 1964, and by Kansas City on December 7, 1964. Each city previously had passed an ordinance authorizing execution of the agreement. The preamble of the agreement recites that the topography is such that certain areas of each city drain naturally into a common water course (Kansas City entirely surrounds Raytown), and that they desired to enter "into a cooperative agreement relating to the construction, operation and mutual use of portions of their respective sewage systems, and to bear equitably between the parties the costs of constructing and operating their respective sewage systems for the mutual benefit of the citizens of each city.

Summarized, the agreement, containing six sections, provided as follows:

I.

Each city is to maintain and operate its own sewage system within its corporate limits. Certain minimum standards and practices are specified.

II.

In building sewers or treatment plants serving common areas, adequate capacity, based on current engineering studies, to be provided. Upstream city, at its expense and according to specified standards, to have a right to connect to any sewer constructed by downstream city in a water course or drainage area common to both cities.

Raytown given immediate and continuing right to connect to Kansas City's Round Grove sewer, and Kansas City given immediate and continuing right to connect to Raytown's Little Blue River outfall sewer.

Kansas City to construct certain sewers as shown on an attached map, contracts therefor to be awarded as soon as practicable after Raytown passed a bond issue to provide funds for the construction which it would be obligated to perform under the agreement. Kansas City also to plan certain other installations and build same upon payment to it of $100,000 by Raytown. Kansas City's construction schedule was made contingent upon a successful election

on the Raytown bond issue not later than December 15, 1964.[1]

Raytown to build certain sewers and facilities, including pumping station and enlarged lagoon, contracts therefor to be awarded as soon as practicable after passage of a bond issue by the city to provide funds therefor.

### III.

Each city to have a continuing right to discharge sanitary sewage into sewers of other as long as this agreement remains in force. Grounds for terminating the agreement are specified as nonpayment of charges, as provided in Section IV, or failure to enforce the restrictions called for in Section I. Before termination, proceedings for arbitration pursuant to the contract and Chapter 435, RSMo 1959, V.A.M.S., required.

### IV.

Schedule of payments by each city to the other established, based on residences, commercial establishments, etc., with provision for renegotiation of schedule each five years.

### V.

Certain continuing rights in each city provided irrespective of other provisions in the agreement.

### VI.

An administrative officer for each city for purposes of administration of this agreement is provided.

The minimum estimated cost of the construction by Raytown was $2,766,000. A special bond election was held in Raytown

on December 1, 1964, at which two propositions were submitted: No. 1, to issue general obligation bonds in the amount of $1,853,000 "for the purpose of acquiring rights-of-way, constructing, extending and improving the sanitary sewerage system of said City, including constructing mains, force mains, lift station and interceptor lines," and No. 2, to issue general obligation bonds in the amount of $913,000 "for the purpose of acquiring rights-of-way, constructing, extending and improving the sanitary sewerage system of said City by constructing lateral sewers," the cost of No. 2 to be repaid to the city by means of special assessments on the property benefitted. Neither proposition received the required two-thirds majority.

A second special bond election was held on February 27, 1965. The same propositions and the same amounts were submitted, but neither proposition received the required two-thirds majority.

On June 15, 1965, the Board of Aldermen of Raytown adopted a resolution which recited that the cooperative agreement was contingent upon successful passage of a sewer bond proposal, that two special bond elections had failed, and that any and all cooperative agreements between Raytown and Kansas City "are hereby expressly and specifically declared to be totally inoperative, rescinded, repealed, null, void, and for naught held." A copy of the resolution was served on Kansas City.

At a regular meeting of the Raytown Board of Aldermen on August 3, 1965, the Mayor reported a demand for a solution of the sewer problem. There was dis-

---

1. No one on either side makes any point of this December 15, 1964, deadline. The agreement was not executed by Kansas City until December 7, 1964, which was six days after the first unsuccessful Raytown bond election on December 1, 1964. It was apparent at the time of execution by Kansas City that there was not sufficient time remaining between then and December 15, 1964, for the required notice to be given for a new election before the deadline. A second

bond election was held February 27, 1965, which Raytown concedes was held in an effort to proceed with the contract, although this was well after December 15, 1964. Consequently, we treat the deadline date, as did the trial court, as being for the benefit and protection of Kansas City, and since it is the only one which could complain of a failure to maintain that schedule, but has made no issue of the point, we pass the matter without further comment.

cussion about proceeding with another bond election on the basis that Raytown would go it alone and build its own sewers. The minutes show the following motion:

"Alderman White restated his motion to set date of October 5, 1965 for election on $2,800,000 sewerage bond issue on the basis that the City will proceed on basis of going alone and with the intent of putting in all sewers necessary to sewer the City of Raytown. Alderman Lanspa seconded the motion. The vote was as follows: YEA: Aldermen Sheil, Grissom, White, Lanspa, McAnany, Clinger, Gautreaux, Shelton. NAY: Alderman Smith. Mayor Frank declared the motion carried by a vote of 8 Yeas to 1 Nay."

The record before us includes a clipping from a Raytown newspaper, the Raytown News, dated August 6, 1965, reporting the August 3 meeting of the Board of Aldermen and the discussion about Raytown voting sewer bonds to build the sewers without joining or cooperating with Kansas City. The headline of the article was "Sewer without K.C. is aim—vote Oct. 5."

On August 12, 1965, the Board of Aldermen met again. An ordinance was introduced which provided that a special election should be held on October 5, 1965, for the purpose of submitting two propositions. The ordinance was given three readings and passed. Proposition No. 1 was "to issue the general obligation bonds of the City of Raytown, Missouri, to the amount of $1,921,000 for the purpose of acquiring rights-of-way, constructing, extending and improving the sanitary sewerage system of said City, including constructing collection mains and interceptor lines, relief sewers, outfall lines, force mains, lift stations, and lagoon expansion," and Proposition No. 2 was "to issue the general obligation bonds of the City of Raytown, Missouri, to the amount of $920,000 for the purpose of acquiring rights-of-way, constructing, extending and improving the sanitary sewerage system of said City by constructing lateral sewers." Both propositions authorized an annual tax to retire the bonds, and Proposition No. 2 provided for the cost of such improvements to be repaid to the city by means of special assessments on the property benefitted. At the election held on October 5, 1965, both propositions received a two-thirds majority of the votes cast.

On December 3, 1965, Raytown presented for approval to the Missouri Water Pollution Board various plans and specifications relating to the construction and operation of a sanitary sewer system within the Raytown corporate limits which would be separate from the Kansas City system and exclude use by Kansas City. Kansas City then filed this action on January 14, 1966, and the Water Pollution Board has withheld action on Raytown's request pending final determination of this action.

The trial court on April 7, 1967, entered summary judgment in favor of plaintiff and denied defendants' motion for summary judgment. Summarized, that judgment provides as follows:

1. Both cities, through authorized representatives, executed the cooperative agreement, which is a valid and lawful contract, pursuant to authority of Article VI, Section 16 of the Missouri Constitution, V.A.M.S. and § 70.220, RSMo 1959, V.A.M.S., as amended.

2. The validity and enforceability of the cooperative agreement was not dependent upon or contingent upon approval by the voters of Raytown, but was effective from and after its execution by Kansas City on December 7, 1964.

3. The agreement was not affected by the resolution passed by the Board of Aldermen of Raytown on June 15, 1965, and was not affected by the unsuccessful bond elections held by Raytown, the agreement having neither been approved nor disapproved by the voters in the elections.

4. The purposes for which the voters of Raytown authorized general obligation bonds on October 5, 1965, do not preclude or prohibit the use of funds derived therefrom for the purpose of financing the facilities contemplated in the cooperative agreement.

5. Kansas City is entitled to exercise the rights intended and contemplated, both immediately and in the future, under the cooperative agreement, and is entitled to demand performance by Raytown.

6. Raytown is entitled to exercise the rights intended and contemplated under the cooperative agreement and is obligated and bound to perform the duties and obligations incurred thereunder, and is obligated and bound to undertake such plans, projects, contracts and actions as are necessary for implementation of the cooperative plan.

The parties agree, and we concur, that the case was before the trial court and is before us on what amounts to an agreed statement of facts and undisputed written documents, and may properly be disposed of by summary judgment. The only dispute is over the conclusions of law to be drawn from the undisputed facts.

Raytown first seeks reversal on the basis that the cooperative agreement between the two cities is ultra vires so far as Raytown is concerned and hence void ab initio. This contention is not based on the idea that Raytown may not make a cooperative agreement regarding sewers. Both Raytown, a city of the fourth class, and Kansas City, a constitutional charter city, recognize the power to make such agreements which is conferred by Art. VI, § 16, Constitution of Missouri, 1945, and § 70.-220, RSMo 1959, V.A.M.S. and V.A.M.S., as amended. Rather, Raytown relies on Art. VI, § 26(a), Constitution of Missouri, 1945, which provides, in part, that no city "shall become indebted in an amount exceeding in any year the income and revenue provided for such year plus any unencum-

bered balances from previous years, except as otherwise provided in this constitution." The documents before the court disclose that the total income and revenue of Raytown for the year in question was $799,893, of which only $51,416 was available for payment of indebtedness. In addition, the city had unencumbered surplus from previous years of $116,961.19, or a total available to pay on general obligation indebtedness in the amount of $168,377.19. The estimated cost to Raytown for proposed construction was approximately $2,766,000. It is Raytown's contention that the obligations assumed by it under the agreement in effect created a general contract indebtedness of the city far in excess of what it constitutionally could assume without prior bond authorization by vote of the people (see Art. VI, § 26(b) and (d)), and therefore the contract was ultra vires and void ab initio. This contention of Raytown necessarily is based on the premise that by execution of the cooperative agreement Raytown became indebted for the cost of making the proposed improvements referred to therein. Actually, the contract did not impose such indebtedness on Raytown. It specifically provided in Section II(g) of the contract that "Raytown will contract for the construction of works outlined in Section (f) above as soon as practical after passage of a successful bond authorization." Thus, the provision requiring Raytown to contract for and build the facilities specified in Section II(f) was conditional. Raytown was obligated if, and only if, the people of Raytown authorized sewer bonds with which Raytown could construct the facilities. Such favorable bond election was the contingency upon which this obligation of Raytown rested. " * * * no promise based upon a condition can be enforced as such until the contingency upon which it depends has happened." McIntyre v. Kansas City, 237 Mo.App. 1178, 171 S.W.2d 805, 811.

■ The cooperative agreement did confer certain immediate rights and obligations, commencing on the effective date of the

contract. Kansas City acquired an immediate right to connect to Raytown's existing Little Blue River outfall sewer, and Raytown a similar right with reference to Kansas City's Round Grove sewer. In each instance, the right acquired by one city imposed a corresponding obligation on the other. These provisions creating immediate rights and obligations with respect to existing facilities were not made contingent on the passage of a bond issue and imposed no indebtedness on Raytown. The additional sewer construction (specified in Section II(f)) to be performed by Raytown, as we have indicated, was contingent on a successful bond election by the voters of Raytown. As stated in McIntyre, supra, Raytown's promise to build the facilities specified in II(f) of the contract, being based upon a condition, could not be enforced until the condition or contingency upon which it depended had actually happened. Until that occurred, Raytown was not obligated to construct anything, and the contract created no indebtedness on the part of Raytown. Consequently, the contract could not and did not violate Art. VI, § 26(a) of the Constitution. We hold, therefore, that the contract was not ultra vires so far as Raytown was concerned and hence was not void ab initio.

■ Raytown also asserts that the June 15, 1965, resolution by its Board of Aldermen rescinded and nullified the cooperative agreement. There is no substance to this contention. The agreement set out the grounds on which the contract could be terminated and the machinery to be followed. There was no authority for Raytown unilaterally to cancel on account of the two unsuccessful bond elections.

The third basis asserted by Raytown for reversal is that the bonds voted on October 5, 1965, were voted as a special fund for financing sewers on a go-it-alone basis by Raytown and constituted a trust fund which cannot be used for any other purpose. Consequently, says Raytown, the trial court erred in holding that there was nothing in the October 5, 1965, proposals which would preclude or prohibit the use of such funds to finance the construction contemplated by the cooperative agreement.

This contention is based primarily on what occurred in connection with the third election, but as background for this proposition, Raytown asserts that the first two bond elections were for the purpose of providing funds for use in connection with the cooperative agreement and that the defeat of those proposals constituted a rejection by the voters of the cooperative agreement. We do not agree. Neither of those proposals made any reference whatsoever to the cooperative agreement. The voters voted on proposals which in general language authorized bonds to provide funds for sewer construction. The people defeated the proposed bond issues, but did not vote upon or approve or reject the cooperative agreement. It was not submitted to a vote of the people.

On August 3, 1965, the Board of Aldermen passed a motion, offered by Alderman White, which would have called an election to vote bonds in the amount of $2,800,000 on the basis of Raytown going it alone and putting in the sewers needed to service Raytown. This action was noted in a newspaper article in the Raytown News on August 6, 1965. Raytown insists that these show that the aldermen submitted to the voters a proposal that Raytown go it alone, that that is what the voters understood and voted on, and that we must look to the minutes of the Council of August 3, 1965, and to the news article reporting that meeting to determine the intent of the voters. Raytown's brief also asserts flatly that the basis of the call for the October 5, 1965, election was the motion offered by Alderman White on August 3, 1965. However, the record before us discloses that the election subsequently held was not pursuant to Alderman White's motion of August 3. Instead, on August 12, 1965, another meeting of the Board of Aldermen was held. At that time, a formal ordinance was introduced by Alderman Lanspa. It

called a special election for October 5, 1965, to vote on two propositions, one for $1,921,000 to be used in constructing, extending and improving the sanitary sewerage system, and one for $920,000 to provide lateral sewers. These two propositions totalled $2,841,000 or $41,000 more than the amount specified in Alderman White's motion of August 3. The August 12 ordinance said nothing about Raytown going it alone or constructing all sewers needed to serve Raytown. Instead, it used general language about constructing, extending and improving the sanitary sewerage system which was comparable to that used in the two earlier bond elections held December 1, 1964, and February 27, 1965. The subsequent published notice of election and the ballots corresponded to the August 12 ordinance, not the August 3 motion.

■ Raytown advances the argument that the August 12 ordinance was unnecessary. Perhaps that would have been true if the Board of Aldermen had concluded to submit a bond issue of $2,800,000 on a go-it-alone basis and had carried out that intention by preparing the election notice and ballots in accordance with the August 3 motion. Instead, the Board of Aldermen passed a new ordinance calling an election for a different sum ($1,921,000 on Proposition No. 1 and $920,000 on Proposition No. 2 instead of a bond issue of $2,800,000) and provided for submission in general terms rather than the go-it-alone terminology employed in the August 3 motion. We should, and do, ascribe some purpose and meaning to the fact that a new and different ordinance was introduced and adopted instead of concluding that the passage of the August 12 ordinance was an unnecessary and meaningless act. We hold that such meaning and purpose was to specify a different amount of bonds to be voted upon and to submit the bond issue in general, unrestricted terms instead of limiting it to a go-it-alone basis. We have considered the Council discussion on August 3, 1965, and the news article which followed, but have concluded that both pertain to Alder-

man White's proposal and do not have the effect of limiting the proposal ultimately approved by the Aldermen for submission and actually voted on by the people.

■ Next, Raytown argues that since the August 12 ordinance, the election notice and the ballot language made no reference to the cooperative agreement, the proceeds cannot be used to carry out that program. This argument seems to assume that the ordinance, notice and ballot must be specific with reference to the actual construction which the Council proposes with reference to the bond proceeds. This contention seems somewhat strange in view of the fact that Raytown recognizes that the December 1, 1964, and February 27, 1965, elections, employing similar general language, and making no reference to the cooperative agreement, were for the purpose of providing funds to use pursuant to the cooperative agreement. If Raytown's premise were sound, the funds could not be used at all because no specific plan or location is specified. Such argument overlooks the fact that usually such bond proposals are in general language and leave to legislative discretion of the Council the exact location and particular projects upon which the funds will be expended. In State ex rel. City of Breckenridge v. Thompson, 322 Mo. 323, 15 S.W.2d 346, 347, the ordinance calling a special election recited that it was "for the purpose of testing the sense of the voters of said city upon the following proposition, to-wit: To incur indebtedness of said City of Breckenridge in the sum of Twenty Thousand Dollars, for the purpose of the improvement of the streets of said city." The statute under which the bonds were proposed, § 8503, RSMo 1919, provided: "Every city of the fourth class in this state shall have and is hereby granted power, authority and right to issue its bonds, within the limits prescribed by the Constitution, for the purpose of paving, graveling, macadamizing, guttering and curbing all or any part of any public street, alley, avenue or public highway." The ordinance was attacked on the

ground that it was indefinite and failed to inform the voters of the proposed action of the Board of Aldermen. This contention was rejected and the court held that the information conveyed by the general terms employed in the ordinance and notice was sufficient. The details of how the money would be spent within the general purposes authorized in the statute were for determination of the Council. See also Petition of City of St. Louis, Mo., 363 S.W.2d 612, wherein this court held that the St. Louis Board of Aldermen could contract to build specific sewer projects in various areas in St. Louis with proceeds to be obtained from unissued sewer bonds, authorized in a 1944 election for the general purpose of constructing, reconstructing, repairing, replacing, reconditioning and improving sewers and drains, including acquiring land therefor. This was true, even though in the interim the Metropolitan Sewer District had been formed and had taken over all sewers in the city and would take over the proposed new sewers when completed.

The ordinance of August 12, the notice of election and the ballot were not ambiguous and were sufficient to inform the voters of Raytown of the general purpose of the bonds and the amount of debt to be created. The details of the improvements were left to the Board of Aldermen. The fact that the Board previously had entered into the cooperative agreement with Kansas City with respect to what those improvements would be, and where they would be located, does not alter the fact that they had determined this question in the exercise of their legislative discretion. Nor does the prior existence of that cooperative agreement result in use of the bond funds for purposes other than those authorized by the vote on October 5, 1965. That contract and compliance therewith was not incorporated by ordinance into the election procedure, was not a necessary part of the general sewer authorization sought from the voters, and, in fact, was not submitted to the voters at the October 5, 1965, election.

We hold, therefore, that there is nothing in the ordinance, notice or ballot to prevent use of the bond proceeds for the purpose of building the facilities which Raytown agreed to build under the terms of the cooperative agreement. We hold further that Raytown is bound by that contract and is bound to perform as it agreed to do, and that Kansas City is entitled to insist on that performance.

■ The trial court indicated that it was not ruling on the validity of the bonds voted on October 5, 1965, apparently leaving that as an open question which could be considered subsequently. The oral findings of fact by the trial court would so indicate, although this is not recited in the judgment which was entered. It is our view that this case cannot be decided without determining the validity of those bonds. Unless they are valid, the contingency on which the obligation of Raytown to construct sewer facilities hinged continues to exist and we could not rule that Raytown is now obligated to proceed with that construction. The pleadings ask that we declare that the cooperative agreement is valid and binding and that the parties are obligated to perform all duties and obligations imposed thereunder, and are entitled to exercise the rights granted to them and to demand performance by the other party. To do this necessarily involves determination of the validity of the bonds.

■ The parties state in their brief and argument that there is no dispute as to the validity of the bonds, the only question being whether the proceeds thereof are available for and are to be used in connection with the construction of facilities which Raytown was to build under the terms of the cooperative agreement. In that connection, Raytown's brief recites that some of the bonds have been registered by the State Auditor and sold. Section 108.240, RSMo 1959, V.A.M.S., provides for registration of such bonds by the State Auditor. If the Auditor refuses to register bonds when presented, the usual

procedure is a suit in mandamus by the city or other proposed issuing entity against the State Auditor. Section 108.240 provides that after receiving a certificate of registration from the State Auditor (and this would be true whether the bonds were registered with or without suit), such bonds "shall thereafter be held in every action, suit or proceeding in which their validity is, or may be, brought into question, prima facie, valid and binding obligations." The section further provides that "the only defense which can be offered against the validity of such bonds shall be for forgery or for fraud." The record before us does not contain anything with reference to registration or issuance of such bonds. We have merely the statement in Raytown's brief. However, the records of the State Auditor reciting his official acts disclose, in fact, that a portion of the bonds authorized by the October 5, 1965, election have been registered by the State Auditor pursuant to § 108.240. Under the circumstances, we take judicial notice of these public records of the State Auditor. Borrson v. Missouri-Kansas-Texas R. Co., 351 Mo. 229, 172 S.W.2d 835. The State Auditor's office, pursuant to § 108.240, examined a transcript of the entire bond election proceedings, established "that all conditions of the laws have been complied with," and, in view of the regularity of the bond election, registered the bonds tendered. That determination, together with what is before us, sufficiently establishes the validity of the October 5, 1965, election and the bonds authorized thereat to enable us to declare the rights of the parties under the cooperative agreement.

What we have said in holding that the trial court properly entered judgment for plaintiff on its motion for summary judgment establishes that the trial court prop-

erly overruled defendants' motion for summary judgment.

We approve and affirm the judgment as entered by the trial court except that we are of the opinion that it should be supplemented or modified by certain additional findings and declarations. The parties have urged us "[to] determine and declare the rights of the parties, dispose of this appeal and [then] 'give such judgment as such (trial) court ought to have given.'" St. Louis Housing Authority v. City of St. Louis, 361 Mo. 1170, 1173, 239 S.W.2d 289, 291.[2] We proceed to do that.

We make the further findings, declarations and judgment:

1. This court finds that the obligations imposed on Raytown in Section II(f) of the cooperative agreement were conditional, being contingent on passage by the voters of Raytown of a bond issue to provide funds for sewer purposes with which said construction could be performed, and that the execution of said agreement by Raytown did not create indebtedness on said city in violation of Art. VI, § 26(a), Constitution of Missouri, 1945.

2. This court finds that some of the bonds authorized at the special bond election held by the City of Raytown on October 5, 1965, have been presented by Raytown to the State Auditor for registration pursuant to § 108.240, RSMo 1959, V.A.M.S., that the Auditor examined the transcript of proceedings and determined that all conditions of the laws had been complied with, and determined that the bonds were valid and registered them, as requested. The court finds that the validity of the bonds authorized at the October 5, 1965, election is established as in § 108.240 provided.

---

2. A motion was filed to advance this case on our docket for the reason that the need for additional sewer facilities is critical and various suits based on bad sewer conditions have been instituted,

that building is restricted, and that health problems could be critical. Both sides have urged a speedy determination and that this court determine the matter finally.

3. This court finds that the bonds authorized at the special bond election held by the City of Raytown on October 5, 1965, provided funds available for performance by Raytown of the construction to be performed by it pursuant to Section II(f) of the cooperative agreement, that the passage of said bond issue satisfied the contingency provided in the cooperative agreement as the condition precedent necessary to the obligation of Raytown to perform the construction called for under Section II(f) of said cooperative agreement, and that said bond election established the corresponding obligation of Kansas City to perform the duties imposed by said agreement but conditioned on passage of a successful bond issue by Raytown.

The findings, decree and judgment of the trial court as supplemented and modified herein are affirmed and the rights of the parties herein are declared as herein stated. It is so ordered.

All concur except STORCKMAN, J., who dissents in separate dissenting opinion filed.

*Dissenting Opinion*

STORCKMAN, Judge.

I agree with the majority opinion that the cooperation agreement does not create an indebtedness within the meaning of Art. 6, § 26(b) and (d) of the Constitution and, hence, it is not invalid for that reason. But I cannot agree that the contract was subsisting at the time of the October 5, 1965, bond issue election or, on the record before us, that the funds derived from the proceeds of the bond issue can properly be used to finance the sewerage system contemplated by the cooperative agreement.

My reasons for this are twofold. First, the facts stipulated by the record demonstrate that by its terms and the declared intention of the parties the agreement had been nullified prior to the October 5 election. Secondly, if on this record the contract is construed as being interminable then it would amount to an unwarranted surrender of municipal rights by the city council of Raytown not authorized by the cooperative statutes and in violation of other statutory and constitutional provisions.

The plaintiff Kansas City filed its declaratory judgment action on January 14, 1966, over a month after the defendant Raytown had presented to the Water Pollution Board, organized under Chapter 204, RSMo 1959, V.A.M.S., plans to construct a sewerage system apart from and to the exclusion of the city of Kansas City. This was more than three months after the October 5, 1965, bond election, and seven months after Raytown adopted a resolution declaring that the contract was terminated. Raytown filed its answer on March 16, 1966, together with its motion for a summary judgment. On April 1, 1966, Kansas City filed its reply and a motion for summary judgment. Both parties filed suggestions in support of their positions at the time they filed their motions. The case was under submission with the trial court for almost a year. On March 21, 1967, there was a conference at which the trial court orally expressed to counsel for the parties its views on various questions involved. More will be said of this later. The judgment with which we are concerned was entered on April 6, 1967, and the appeal was taken to this court on April 11, 1967.

As indicated above, both parties filed motions for summary judgment as well as their formal pleadings. While no evidence was adduced at the hearing on March 21, 1967, the record discloses that further stipulations as to the facts were made as follows:

"THE COURT: * * * I don't believe that there is any real conflict as to the facts in this case. The pleadings, the attachments to the motion of defendant and the motion of plaintiff each for summary judgment, together seem to give the full story as fully and completely as might be revealed by adducing the evidence at length.

"Now I will turn to each of you and see if the Court has been in any way mistaken in this. First, does plaintiff contest anything that is factually asserted by the defendants collectively, meaning, of course, the City of Raytown through its Mayor and councilmen?

"MR. MASON: Your Honor, on behalf of Kansas City we concur with the Court that *the documents and exhibits that are attached to the pleadings and the facts that are pled in the pleadings are ones on which there is no dispute.*

"With, and I say this, with only the exception that I do believe that the importance or the materiality of the various and sundry *facts alleged and set forth not only in the pleadings but in the exhibits,* the degree with which those will determine the issues as a legal matter I believe varies.

"THE COURT: I had no thought of causing either of you to waive your position with respect to the relevancy of any of these materials.

"I see you nodding, Mr. Raymond. Does that express your views?

"MR. RAYMOND: He may not agree as to some conclusions I drew, and I may not agree with some of his conclusions, but *the facts are not in dispute, as I see it.*

"THE COURT: Very well, that enables us to dispose of it, I believe, as effectively at this stage as we would after an evidentiary hearing." Italics added.

Exhibit D, attached to plaintiff's petition, is a copy of a resolution by the Board of Aldermen of Raytown approved June 15, 1965, which declared that the cooperation agreement was "totally inoperative, rescinded, repealed, null, void, and for naught held." The exhibit makes this recital: "WHEREAS, another Cooperative Agreement for Sewer Service was entered into by Raytown, Missouri, with Kansas City, Missouri, on or about February 3, 1965, pursuant to Ordinance No. 112, Section XXI–B–5 of the Compiled Ordinances of Raytown, adopted February 2, 1965; said agreement being contingent upon the successful passage of a Sewer Bond proposal by the qualified voters of Raytown not later than April 15, 1965."

The trial court at the hearing on March 21, 1967, in referring to this statement in Exhibit D, said:

"THE COURT: * * * I don't want to be too free in my assumptions here, but since neither plaintiff nor defendants have further referred to this I shall likewise ignore it, unless counsel has some different position in the matter.

"MR. RAYMOND: I know nothing about it, your Honor.

"THE COURT: Then we will treat it as being that we are only concerned with the agreement executed by Raytown on November 5th and by Kansas City on December 7, 1964."

While I do not regard the supplemental agreement as vital to the decision of the case, it is a part of the "full story" and is the only rational explanation of the second submission of the proposal to the voters. The trial court was not justified in ignoring it regardless of the response of defendants' counsel. If there was any doubt about it, the matter should have been clarified at that point since a summary judgment should not be rendered "unless the prevailing party is shown by unassailable proof to be entitled thereto as a matter of law." S.Ct. Rule 74.04(h).

In a footnote, the majority opinion passes lightly over the provisions in Section II (e) of the contract that the construction schedules "are contingent upon the authorization of a bond issue by Raytown in amount sufficient to finance improvements outlined in sub-sections (f) and (g) of this section not later than December 15, 1964". The opinion ignores this limitation on the theory that it was for "the benefit and protection of Kansas City" which was the only one that could complain and it had

not done so. This treatment of the matter overlooks the basic facts and is contrary to applicable law as we shall later demonstrate. The formal execution of the contract by Kansas City, although dated December 7, 1964, was made pursuant to a Kansas City ordinance approved and authenticated as passed on October 30, 1964. A copy of this Kansas City ordinance is attached as Exhibit A to plaintiff's petition. The contract was executed on behalf of Raytown on November 5, 1964. Thus it was known by Raytown on November 5 that it would have to hold an election for the approval of the bond issue on or before December 15, 1964. There was sufficient time to give notice of the bond election after the legislative bodies of each city had approved the agreement. Why Kansas City delayed in signing is not disclosed; nevertheless, the court is not warranted in ignoring the undisputed facts. The date mentioned in the cooperative agreement for holding the election is important as it bears on the binding effect of the contract as well as the intention of the parties. We do not agree that this or any other deadline date can be treated only for the benefit of Kansas City. To hold otherwise would impose on Raytown the obligation to continue indefinitely and interminably to hold elections until a bond issue was approved. This would be adverse to public interests. 17A C.J.S. Contracts § 398, p. 478; Shikles v. City of Clinton, Mo.App., 319 S.W.2d 9.

Appellate courts review court-tried cases on both the law and the evidence as in suits of an equitable nature. S.Ct. Rule 73.01(d); Needles v. Kansas City, Mo., 371 S.W.2d 300, 307 [10]. We must review the entire record and make our own conclusions on the facts. The record shows and the plaintiff does not deny that a supplemental agreement was made in February 1965 extending the cooperation agreement for a second submission of the proposal not later than April 15, 1965. We must accept this factual statement as true

and give it the weight to which it is entitled.

Section 16, Art. 6, of the Constitution is a specific grant of authority for municipalities and political subdivisions to enter into cooperative agreements with each other in the manner provided by law. School District of Kansas City v. Kansas City, Mo., 382 S.W.2d 688, 696 [11]. However, contracts made by a municipal corporation when lawfully authorized are no different from other contracts in that they are measured by the same standards and are subject to the same rights and liabilities. Burger v. City of Springfield, Mo., 323 S.W.2d 777, 783 [2].

In this case, both of the contracting parties are municipal corporations and each has the advantages and disadvantages of the mandatory provisions of § 432.070, RSMo 1959, V.A.M.S., which requires that contracts of municipal corporations must be in writing; any term or condition not included in the written contract has no validity. Needles v. Kansas City, Mo., 371 S.W.2d 300, 306–307 [5–9]; Burger v. City of Springfield, Mo., 323 S.W.2d 777, 782–783 [1, 2]. In making the supplemental agreement, both parties recognized that unless an extension of time for performing the contingency was agreed upon and reduced to writing, § 432.070 would render the cooperation agreement invalid and unenforceable by or against either party. The construction that the parties place on their contract as evidenced by their acts and conduct prior to controversy is strong evidence of their real intention. See 7A Missouri Digest, Contracts ■■■■■■

Furthermore, unless the dates of December 15, 1964, and April 15, 1965, are given significance, the contract would at all times have been for an indefinite period and could have been terminated at will by either party. Sharp v. W. & W. Trucking Company, Mo., 421 S.W.2d 213 (No. 52, 600, decided November 13, 1967); Superior Concrete Accessories v. Kemper, Mo., 284 S.W.2d 482; Paisley v. Lucas, 346 Mo.

827, 143 S.W.2d 262; 17 Am.Jur.2d Contracts § 486, p. 956; 17A C.J.S. Contracts § 398, p. 478. Termination was accomplished, or confirmed, by the resolution of June 15, 1965, adopted by the defendant and served on the plaintiff.

If the duration of the obligation of Raytown to submit the proposal was not limited in some manner, the contention of the defendants that the cooperative agreement created a present unconstitutional indebtedness would be more plausible. Furthermore, § 70.260 recognizes that the right of termination exists and permits specific terms and conditions with respect thereto to be put in the contract, but it requires the party cancelling the contract to compensate the other for any cost or expense incurred. The statute provides: "Such contract may include and specify terms and provisions relative to the termination or cancellation by ordinance, order or resolution, as the case may be, of such contract or cooperative action and the notice, if any, to be given of such cancellation, provided that such cancellation termination shall not relieve any party participating in such contract or cooperative action from any obligation or liability for its share of the cost or expense incurred prior to the effective date of any such cancellation." Nonpayment of charges and violation of certain restrictions are specified in the contract as grounds for terminating the agreement, and the provisions for arbitration in Chapter 435, RSMo 1959, V.A.M.S., are to be applied. However, neither the constitution, the statutes, nor the contract precludes termination on other grounds available under the general law. The arbitration provisions cannot oust the courts of their jurisdiction. Section 435.010.

The constitutional provision, § 16 of Art. 6, does not purport to authorize the imposition of an obligation in perpetuity upon municipalities which enter into cooperation contracts and the general assembly could not legislate contrary to the specific grant of power. Furthermore, the municipal cooperation statutes recognize that such

an agreement may be discontinued or terminated on an equitable basis even after it is in operation. I would hold that the cooperation agreement had expired by its own terms and that it was definitely terminated by the Raytown declaration and resolution adopted on June 15, 1965.

Regardless of the legal status of the cooperative contract on October 5, 1965, the bond issue approved on that day can only be related to an intention on the part of the voters of Raytown to construct a sewerage system of their own, independently of Kansas City. There is nothing in the record especially after April 1965 which can logically be said to indicate an intention on the part of the Raytown Board of Aldermen or voters to use bond issue funds to finance a cooperative sewerage system. The evidence is all to the contrary. When a proposition to borrow money is submitted to the people, the object for which the money is to be appropriated is an integral part of the proposition and is necessary to make the proposition intelligible. State ex rel. School District of Memphis v. Gordon, 223 Mo. 1, 122 S.W.2d 1008, 1012 [5]. This case also holds that the vote of the people on such a proposition is in the nature of a legislative act or "a local act." See also Carson v. Oxenhandler, Mo.App., 334 S.W.2d 394, 406 [11]. Its form and substance must comply with the usual legislative standards and be subject to the usual rules of construction. The purpose is to prevent unjust and unfair maneuvering to defraud the people and defeat their real intention. See also 21A Missouri Digest, Municipal Corporations, 

A latent ambiguity exists where the words used in a written instrument or proposition are unambiguous on the face of it but apply equally to two different things or subject matters. 12A Missouri Digest, Evidence, In that event evidence is admissible to determine which was intended. City of St. Louis v. Pope, 344 Mo. 479, 126 S.W.2d 1201, 1209 [2, 3]. The rule of evidence is not important in

this case, however, since all of the facts are stipulated in the record and may be considered to the extent that they are relevant and material.

In this legal situation the essential question to be determined is whether the legislative intention was that the funds derived from the October 1965 bond issue should be used to construct an independent sewerage system or one jointly with Kansas City. Meyering v. Miller, 330 Mo. 885, 51 S.W.2d 65, 68 [2]. There is nothing on the face of the propositions stated or ballots used at the three special elections to indicate which was intended or to disclose that there was more than one plan in existence. There is, however, a difference in the statement of the October 1965 proposition when compared with the two previous ones. The amounts in the first two propositions submitted were the same, a total of $2,766,000. The October 1965 approved bond issue was for $75,000 more, or a total of $2,841,000. Proposition One in the first two elections was stated to be "for the purpose of acquiring rights-of-way, constructing, extending and improving the sanitary sewerage system of said City, including constructing mains, force mains, lift station and interceptor lines." In the third and successful submission, the inclusion in Proposition One was for "constructing collection mains and interceptor lines, relief sewers, outfall lines, force mains, lift stations, and lagoon expansion." Thus, we see in the third submission the objects included were increased. Collection mains, relief sewers, outfall lines and lagoon expansion were added, and the lift station was made plural.

Other significant facts to be considered are these. There was no written extension of the cooperative agreement beyond April 15, 1965. On June 15, 1965, the Raytown Board of Aldermen adopted a resolution reciting thaat the bond issue had been submitted twice and failed of adoption, that recently Kansas City officials had stated that there was a valid, existing cooperative

sewer service agreement, that the Board was seeking "to refute and still said statements", and, therefore, the cooperative agreement, including all of its terms "are hereby expressly and specifically declared to be totally inoperative, rescinded, repealed, null, void, and for naught held." The minutes of the regular meeting of the Raytown Board of Aldermen held August 3, 1965, show that the mayor of Raytown proposed that a bond election be held on October 5 or October 19, 1965, and recommended that they proceed on the basis of "building Raytown Sewers for Raytown". Alderman White then moved that the City "go on its own", and that an election on a $2,800,000 sewerage bond issue be held on October 5, 1965, that the City "proceed on basis of going alone and with the intent of putting in all sewers necessary to sewer the City of Raytown." The motion carried by a vote of 8 to 1. In the newspaper, Raytown News, of August 5, 1965, there appears the headline "Sewers without K. C. is aim—vote Oct. 5". The news article stated that the Board of Aldermen had determined to "go it alone" without Kansas City, that two previous propositions based on the tie-in with Kansas City were defeated. The news article also reports statements by the mayor and various members of the Board, all of whom expressed a preference to build an independent system, except the dissenting member of the Board who believed it would be cheaper to cooperate with Kansas City. At a meeting of the Board of Aldermen on August 12, 1965, a formal ordinance was adopted ordering the election on October 5, 1965, for the purpose of submitting to the qualified voters of Raytown the two propositions described above. The clerk was also directed to publish the required three weeks' notice and the form of the official ballot was set out in the ordinance. The bond issue was approved by the required majority of the voters on October 5, and on December 3, 1965, Raytown presented to the Missouri Water Pollution Board a statement of policy and other information relating to the construction, operation, maintenance

and repairs of a sanitary sewerage system for the City of Raytown separately, apart from, and exclusive of Kansas City. Action on the application has been withheld on objection by Kansas City.

If anything is certain on this record, it is that the voters of Raytown by their vote of October 5 did not intend to implement the cooperative agreement with Kansas City. Every act subsequent to April 1965 showed a purpose to solve their sewerage problem by acting alone and independently of Kansas City. To hold that the funds must be appropriated to finance the cooperative agreement is a manifest distortion of the legislative intention of this "local act". If the cooperative agreement were still in effect, it cannot be said that the voters approved a bond issue intended to fulfill the condition and contingency necessary to make the contract operative. The cooperative sewerage plan may very well be a better and more economical one, but this court has no jurisdiction to do the thinking for the people of Raytown and to order the Board of Aldermen to enter into contracts and make appropriations contrary to the intention of the voters clearly expressed in the manner provided by law.

In a more familiar and commonplace setting, the principles involved would be recognized and present no problem. Suppose two men in similar businesses needed additional warehouse facilities. Mr. A owned suitable land and Mr. B agreed to supply financing for the building but had to borrow the money; they would also share existing facilities. They entered into a tentative agreement on November 5, 1964, which was contingent on B borrowing the money by December 15, 1964. On December 1, B's banker turned him down. Thereafter, it was agreed that the time for B to make his loan would be extended to April 15, 1965. B did not get around to seeing his banker, however, until April 27, when he was again turned down. After that B decided to build his own warehouse and notified A that their cooperative plans were ended. Thereafter, B presented his independent plans to his banker who liked the new project and agreed to make the loan. A re-enters the picture and claims B and his banker must use the proceeds of the loan commitment to finance the cooperative warehouse. Obviously, the contract never became effective and A would have no standing in court.

I also disagree with the majority opinion in that it gratuitously undertakes to decide issues not made by the pleadings or presented or briefed either here or in the trial court such as adjudicating the validity of the bonds issued. Such generous and expansive treatment is unsound and dangerous to the parties and the law. In this case we have repeatedly been reminded that a solution of the sewerage problem in Raytown is urgent and this court has cooperated by advancing the case on the docket, but more is involved than rendering an expedient decision. It may be an unhappy precedent for years to come.

The basic element involved here is whether the voters of Raytown intended to approve a bond issue to implement the cooperative agreement which the contract recognizes as indispensable to its effectiveness. This is the decisive and controlling issue. Efforts have been made to patch up the record in other ways, but there is bound to be more evidence of the legislative intention than has been produced.

The cause should be remanded for a full hearing in view of legal and factual deficiencies disclosed especially since this is a summary judgment procedure. Otherwise, on the present record, I would declare the issues in favor of the defendants and against the plaintiff.

For the reasons stated, I respectfully dissent.